No. 13,459.

OCCIDENTAL LIFE INSURANCE COMPANY *v.* UNITED STATES
NATIONAL BANK.
(53 P. [2d] 1180)

Decided December 23, 1935.

Messrs. SMITH, BROCK, AKOLT & CAMPBELL, for plain-
tiff in error.

Mr. HARRY C. RIDDLE, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE BUTLER delivered the opinion of the court.

THIS writ of error was sued out to obtain the reversal of a judgment in favor of the United States National Bank of Denver against Occidental Life Insurance Company in an action on an insurance policy.

On December 14, 1920, the Insurance Company insured the life of William Doane Watson, agreeing to pay $10,000 upon the death of the insured. Attached to the policy and made a part thereof was a "Double Benefit Supplement," agreeing to pay to the beneficiary the additional sum of $10,000 if the insured should die within ninety days after, and as the result of, sustaining bodily injury (except in case of suicide while sane or insane) "effected by the happening of a purely accidental event." In May, 1931, the insured borrowed money from the Insurance Company and assigned the policy to it as collateral security. Thereafter he borrowed money from the United States National Bank and, as collateral security for the loan, assigned to it the policy, subject to the assignment theretofore made to the Insurance Company. On August 23, 1932, the insured died of a revolver-shot wound. On October of that year the Insurance Company paid to the Bank, under the straight life insurance policy, $8,364.90, being $10,000, less the amount owing by the insured to the Insurance Company. It refused to pay the additional sum under the "Double Benefit Supplement," whereupon the bank commenced this action.

Dudley D. Watson, brother of the insured and associated with him in business, was a witness for the bank. He testified substantially as follows: The insured came to the company's office at about 9 o'clock on the day of

his death, went to his desk and began his morning work in his customary way. He had been carrying out his work as usual for some time before his death. The insured had particular charge of looking after the installation of some work that started that morning. Insured made some telephone calls in connection with company business, and then left the office about 9:15 a. m. He came back between 10 and 11 o'clock, took care of some more work at his desk, looked at some mail and had some papers in his hand. The witness left the office to go to lunch between 12:30 and 1 o'clock, but did not remember whether the insured was in the store when he left or not. The witness returned to the store about a quarter after 1. He did not notice anything unusual at the store, but he did not see the insured. Later in the afternoon, the witness was anxious for some information which the insured had about some merchandise and inquired whether he had come back or not, and was informed by others around the office that he had not been seen. Some time between half past 2 and 3, the witness went into the basement and found the insured lying dead on the basement floor. His body was 3 to 4 feet from the freight elevator in the rear of the basement. He was dead from a pistol shot. The witness saw a revolver. It was "kind of under his coat, under the left side of his coat, which was open." His right hand was rather toward his waist a little bit, over toward the floor. The revolver was not actually held in the right hand, but was lying a few inches therefrom. The revolver shot was in his right temple. To get into the basement it was necessary to come into the store or office upstairs and then go into the basement through either the freight elevator at the back or the stairway at the front.

Miss Lou Mackey, an employee, testified substantially as follows: The insured, when he arrived at the office, greeted everyone and then started attending to company business. He went about his business in the usual way, and had been doing that for some time before. At about

quarter to 10 he left. Witness did not see him when he came back. She was continuously in the office from the time of her arrival until after the body was found, except during her lunch time, which was between 12 and 1 o'clock. She did not hear any pistol shot or anything unusual; never heard any disturbance in the basement or anything else to arrest her attention. Insured was normal in all respects, so far as witness knew, except that occasionally he suffered from hay fever. On the morning of his death he was making diagrams of some work for the company.

Police officer Madigan testified that on the day in question he went to the place to investigate the death; that the body was between 50 and 75 feet from the front stairway and from 3 to 5 feet from the elevator shaft; that the body was lying on the left side; that the gun was held limply in the right hand, laid "kind of over toward the left side of the body"; and that there was evidence of blood on "the gun wound and the head." (The abstract had it "gun, wound and head," but we have followed the record). He testified, also, that around the body the floor was clear; that he saw no rubbish there that a man could have stumbled over; that he discovered no evidence of a scuffle, or of any murder or foul play; and that Deputy Coroner Bostwick opened the gun, and there was only one bullet discharged.

Deputy Coroner Bostwick testified that he was with Madigan and saw the body on the basement floor; that the basement was lighted; that the right hand was lying on the right side of the body; that a revolver was lying on the left side, on the coat, about 9 or 10 inches from the left hand; that the gun was not clutched in the right hand when he saw it; that there was no sign of a scuffle there; that the basement floor had not been disturbed, as far as he could see; and that he did not see any signs of foul play.

The court admitted a copy of the death certificate certified by the state registrar of vital statistics. Among

other things, the following appeared therein: Printed: "The principal cause of death and related causes of importance were as follows:" Typewritten, "Revolver shot wound head." Printed, "If death was due to external causes (violence) fill in also the following: Accident, suicide or homicide?" Typewritten, "Suicide." Counsel for the Bank objected to the answer to the last question only. The court admitted the entire certificate, stating that suicide was immaterial, and that at the proper time he would instruct to that effect.

Ada Walker testified that she was cashier for the defendant company and was such on August 23, 1932; that, as cashier, her duty was to keep the records of the policies and premium payments on policies that the company had outstanding; that she kept such record on the policy issued on the life of William Doane Watson and kept written records of premium payments; that the premium was due on the policy on August 23, 1932, the date of the death of the insured; that it was originally due May 23, 1932, but the premium was not paid when originally due on May 23, 1932, and the company had extended the time of payment up until August 23, 1932. The Insurance Company offered to prove by the witness "that the decedent, William Doane Watson, did on August 23, 1932, at about 11 a. m., inquire of said witness Walker, cashier of the defendant company, as to the status of said policy, and was informed by the said witness Walker that the premium was due on said policy on August 23rd and would have to be paid on that date else the insurance would be void, and that the said decedent, William Doane Watson, replied to the witness Walker that he would take care of it." The court refused to receive the offered evidence, holding that suicide is no defense.

At the close of the evidence the court directed a verdict for the bank in the sum of $10,891.10, and rendered judgment on the directed verdict.

■ There was no evidence having the slightest tendency to show that the insured was insane, nor was it

contended that he was insane. Throughout the trial the court acted on the assumption, though there was no direct finding, that the insured committed suicide while sane. The court held that the Insurance Company was liable by virtue of section 2532 of Compiled Laws of 1921, which is as follows: ''From and after the passage of this act, the suicide of a policy-holder after the first policy year, of any life insurance company doing business in this state, shall not be a defense against the payment of a life insurance policy, whether said suicide was voluntary or involuntary, and whether said policy holder was sane or insane.'' Since the trial of this case we have held that that section does not apply where a policy provides for the payment of money upon the accidental death of the insured and the insured commits suicide while sane. *Capitol Life Ins. Co. v. Di Iullo,* 98 Colo. 116, 53 P. (2d) 1183.

There was no determination of the question whether the death of the insured was accidental in the usual meaning of that term.

■ ■ When death by unexplained violent external means is established, the law does not presume suicide or murder; the presumption is to the contrary. Such a showing is prima facie proof that the death was accidental. *Preferred Accident Ins. Co. v. Fielding, Admr.,* 35 Colo. 19, 83 Pac. 1013; *Bickes v. Travelers Insurance Co.,* 87 Colo. 297, 287 Pac. 859; *Lampkin v. Travelers Ins. Co.,* 11 Colo. App. 249, 52 Pac. 1040. But that prima facie showing may be overcome by evidence, either direct or circumstantial. In the present case there was more than the bare fact of death by unexplained violent external means; there were circumstances sufficient to require a finding whether the death was accidental or suicidal. In such a situation the widest latitude of inquiry as to the existence of a motive to commit suicide should be permitted to enable the insurer to overcome, if it can, the presumption against suicide. The rejection of evidence tending to show that the insured had a motive

to commit suicide is error. *Occidental Life Ins. Co. v. Graham* (C.C.A., Eighth Circuit), 22 F. (2d) 528. The matters that the Insurance Company offered to prove by the witness Ada Walker were admissible as bearing upon the question of whether or not the insured had a motive to commit suicide, and its rejection, in the circumstances of this case, was reversible error.

As the case must go back for a new trial, it is well to dispose of a question that in all probability will arise again at that trial. That question is the admissibility of that part of the death certificate indicating that the death of the insured was suicidal. It was admissible. Section 976 of Compiled Laws of 1921 requires the death certificate to state, among other things, "Causes of death, which may be the result of either disease or violence, shall be carefully defined; and, if from violence, its nature shall be stated, and whether (probably) accidental, suicidal or homicidal." Section 990, Id., provides: "That the state registrar shall, upon request, furnish any applicant a certified copy of the record of any * * * death, registered under provisions of this act, * * *. And any such copy of the record of a * * * death, when properly certified by the state registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated."

The judgment is reversed, and the cause is remanded for a new trial.