ERNEST H. Bjorkman sued the Prudential Life Insurance Company of America, hereinafter called the defendant, on a policy of insurance and obtained judgment for $1,036.26, being the face of the policy with interest. The defendant sued out this writ of error, seeking a reversal of the judgment. While the case was pending in this court Bjorkman died, and Foster Cline, as executor of his estate, was substituted as defendant in error.
On January 18, 1933, the defendant insured the life of Agnes L. Bjorkman for $1,000 for the benefit of her husband, Ernest H. Bjorkman. The insured died within the year, to wit, on October 18, 1933. Upon the refusal of the defendant to pay the amount of the policy, Bjorkman sued. So far as pertinent here, he alleged the issuance of the policy and the death of the insured. The answer admitted the issuance of the policy and the death of the insured; but, as an affirmative defense, pleaded that the policy provided that "if within one year from the date hereof the Insured, whether sane or insane, shall die by suicide, the liability of the Company shall not exceed the amount of the premiums paid on this policy"; that within the year the insured committed suicide; and that the amount of premiums paid was $37.14, which the defendant tendered to the plaintiff. The replication denied that the insured committed suicide.
[1] The plaintiff proved the allegations of his complaint, whereupon the defendant undertook to establish its affirmative defense of suicide. The court correctly instructed the jury, in substance, that the defendant had the burden of proving that the insured committed suicide, and if the jury found from a preponderance of the evidence that the insured died by suicide, their verdict *Page 277 
should be for the defendant; otherwise, their verdict should be for the plaintiff. The verdict for the plaintiff for the full amount of the policy means that the jury found that the defendant did not prove by a preponderance of the evidence that the insured committed suicide. The defendant contends that that finding was wrong, and that the court erred in not directing a verdict for the defendant.
[2] The court gave the following instruction: "Suicide must be proven, and if you can reconcile the facts of this case upon any reasonable hypothesis, based upon the evidence, that death of the insured was not caused by suicide, it is your duty to do so." As the defendant made no objection to the instruction, it became the law of the case. Supreme Court rule No. 7. Its correctness is not challenged at this time. Was the evidence such as to exclude all reasonable hypotheses other than that of suicide? If so, was such evidence so clear as to make it the duty of the trial court to take the case from the jury and direct a verdict for the defendant? If these two questions require an affirmative answer, the judgment should be reversed; otherwise, the judgment should be affirmed. After a careful consideration of the evidence, we conclude that the questions should be answered in the negative.
[3] The general and natural presumption is against suicide. Hershey v. Agnew, 83 Colo. 89, 262 Pac. 526.
Alfred M. Du Bois, a witness for the defendant, testified on direct examination that he had known Mrs. Bjorkman a long time; that on the night of October 18, 1933, he saw her coming out of the Myers drug store, at Eighth and Santa Fe in Denver; that he had gone there in his car to meet her; that she walked up to his car with a cup in her hand and drank the contents of the cup, saying "I have done it"; that he asked what she drank, and she answered, "Black Leaf 40" (which, the evidence shows, was a deadly poison); that she then dropped the cup; that he put her in the car and took her to the General *Page 278 
Hospital (a few blocks away); that she was very sick, gagging "like she wanted to throw up"; that she died within a few minutes after being admitted to the hospital; and that the cup was found when he went back with the officers.
On cross-examination, he testified as follows: "Q. As she approached there, standing in front of you and you were outside the car, who spoke first? A. I didn't say a word. Q. What did she say? A. 'I have done it.' Q. I have done it? A. Uh, huh. Q. Then did she drink the contents of the cup, or before? A. After. Q. Did she drink the contents afterwards or before she said that? A. After she drank it. Q. That is, as she stood right in front of you she drank the contents and then said `I have done it'? A. Yes, sir. Q. That is all she said? A. That is all she said. Q. What did you say? A. I said 'What did you take' and she told me Black Leaf 40. * * * The only thing was said was the remark she made. Q. Did she make any further remark that evening in the car? A. No. Q. Not a word? A. No. Q. All she said was 'I have done it'? A. Yes. Q. That is not all she said, was it? A. That is all she said. Q. I thought you said awhile ago she said 'I took Black Leaf 40.' A. She did, to start with. I asked what she took and she said 'I took Black Leaf 40.'" Later on he testified: "Q. And on that same occasion didn't you tell these two investigators that as Mrs. Bjorkman approached the car you asked her what she had in the cup and she replied `Coca Cola and aspirin'? A. Yes, that is right. Q. So you didn't relate all the conversation awhile ago, did you? A. Maybe I didn't. Q. Why didn't you? A. I don't know. I am a witness here and maybe I overlooked it." He also testified that he and Mrs. Bjorkman were very good friends; that he met her first while he was working for her husband; that he never wrote her any letters; that they never kept company; that he went to the World's Fair and saw her there; that he supposed they went on the same train, but did not go there *Page 279 
together; that he refuses to say whether they came back on the same train; that she never intimated to him that she was in a family way; that he never offered to help her in any way; that he wrote the note marked Exhibit I; that on the day of her death she telephoned asking him to come to Eighth and Santa Fe to get her; that he "imagines" she held the cup in her right hand, but is not sure; that he is a drinking man, but was not drinking that night; that he did not know that she was intoxicated at that time, could not truthfully say she was not, she might have been; that she did not vomit on the way to the hospital; that he had seen her intoxicated, but could not tell how many times; that he did not know she had a diamond ring.
Officer Wilson testified that he and officer Niles took Du Bois from the hospital to Eighth and Santa Fe and found a cup in the gutter; that there had been some dark colored liquid in it, but no analysis ever was made of the contents; that upon being questioned, Du Bois stated that Mrs. Bjorkman first told him she had taken aspirin and Coca Cola and began to vomit afterward, and later made a statement that she had taken Black Leaf 40; that Du Bois had been drinking; that there was "vomit all over the car." He also testified that the plaintiff told witness that Mrs. Bjorkman had done, or attempted to do, the same thing two years before by taking Black Leaf 40, but did not say that he had seen her take it. The plaintiff denied making such statement. Officer Niles gave substantially the same testimony as did Wilson.
Edgar A. Lawver, a druggist and registered pharmacist employed at the Myers drug store at Eighth and Santa Fe, testified that shortly after six o'clock on the evening of October 18 he sold one ounce of Black Leaf 40 to a woman; that it is an insecticide; that the woman said she wanted it to kill lice on her plants; that he has a "vague impression" that the woman was dressed in dark clothes; that he could not at all recognize Mrs. Bjorkman's picture, which was shown to him; that the woman *Page 280 
to whom he made the sale was about 5 feet 6 or 7, did not appear tall; that he does not think she had on a red dress; that he told the investigator that he thought the woman he sold to was dressed in dark clothes; that his best recollection is that she did not have on a red dress; that a little more than a week later he saw Mrs. Bjorkman's picture and said he could not remember that was the woman; that he made but one sale of Black Leaf 40 that evening; that they are permitted to sell it without a doctor's prescription — do not even have to register the sale.
The defendant introduced in evidence a copy of the death certificate certified by S. R. McKelvey, state registrar of vital statistics, in which suicide is given as the cause of death. The original death certificate, filed with the registrar, was signed by Deputy Coroner Bostwick.
In rebuttal the plaintiff called several witnesses. The plaintiff testified that his wife's dress was the same color as her jacket, same degree of red; that his wife was 5 feet and 5 inches tall.
Paul Nord, a druggist then in the employ of a drug store across the street from the Myers store, testified that between six and seven o'clock on the evening in question a woman wanted to buy some paper cups; that they had none for sale, but he gave her a cup from the fountain; that he does not think that Exhibit H (a photograph of Mrs. Bjorkman) is a picture of the woman; that he could not say exactly how the woman was dressed, only she had dark clothes on; that he was behind the counter; that what he saw of her was black; that he did not pay any particular attention to the appearance of the woman.
Deputy Coroner Bostwick testified that the statement in the death certificate signed by him was not based on personal examination, or upon anything told him by the plaintiff; that no autopsy was performed; and that the witness thinks O'Brien investigated the case.
J. P. Deveraux, a restaurant manager at 760 Santa Fe *Page 281 
Drive, testified that Mrs. Bjorkman came to his restaurant with Du Bois frequently — on an average of once or twice a week; that she was there alone on October 18 at about two o'clock in the afternoon; that she was intoxicated, caused a disturbance of all kinds and threw her shoes; that he ejected her from the place three times that day; that the last time she was there was between five and six o'clock; that her condition then was worse; that she was intoxicated beyond the point of being responsible; that she abused the customers, would fight and do everything she possibly could to be an annoyance and a detriment to the business; that she was not in possession of her normal faculties; that she requested liquor, and he refused to let her have any; that she went out and returned with a bottle of whiskey; that she was inebriated, weaved from one side to the other, and he put her out.
Mary Murphy testified that she saw Mrs. Bjorkman at about half past three in the afternoon of the day she died; that she was either sick or drunk, was unable to walk, and was going to fall; that she left witness at four or four fifteen; that she had on a red dress and black jacket; that her skirt was the color of Exhibit K. That exhibit is before us. It is Mrs. Bjorkman's jacket, in color a flaming light red.
Peter S. Murphy testified that at four o'clock on the day in question he saw Mrs. Bjorkman; that she was intoxicated, was staggering and noisy; that she wanted to go home; that witness wanted to take her home, but she said that she would telephone her nephew to take her home; that witness gave her a nickel to enable her to phone.
Mrs. Alice Culp testified that she saw Mrs. Bjorkman at noon on October 18; that she was standing on the sidewalk, seeming to be waiting for somebody; that she told witness she was paralyzed; that between four and five o'clock the same day witness saw Mrs. Bjorkman again; that Mrs. Bjorkman was weaving back and forth; that *Page 282 
she had something white that looked like a bottle of milk in her hand, was holding it aloft in the air and screaming at the top of her voice; that Mrs. Bjorkman went into the back door of 901 Acoma and down in the basement, and witness saw her no more.
Counsel for plaintiff offered in evidence Exhibit I, a letter admittedly written by Du Bois. It was offered for the purpose of contradicting his testimony that he never wrote to the insured and never offered to help her. It clearly had that tendency, but it was not admitted in evidence. Dr. Bjorkman was 74 years old; his wife, 38; Du Bois, 34. Such was the evidence in the case.
Considering the record, was it the duty of the trial court to direct a verdict for the defendant? Do the evidence and the inferences reasonably to be drawn therefrom lead to only one conclusion; namely, that the insured committed suicide? Do they reasonably exclude the hypothesis that death resulted from some cause other than suicide; for example, that if the insured took poison, she did so accidentally and not for the purpose of taking her life? The burden rested upon the defendant to prove suicide, not upon the plaintiff to prove some other cause; for instance, the accidental taking of poison.
[4] Though the certified copy of the death certificate was prima facie evidence of suicide, its weight depends, of course, upon the information upon which the certificate was based, the source of that information, and the manner in which it was obtained.
The woman who purchased the insecticide said it was to kill plant lice. She was dressed, not in flaming red, as Mrs. Bjorkman was dressed, but in dark clothes, according to Lawver's recollection. Shown Mrs. Bjorkman's picture about a week after he sold the insecticide, Lawver told the investigator he could not remember that that was the woman who bought, and on the witness stand he was shown the picture again, and said he "could not recognize it at all." If Mrs. Bjorkman — drunken, staggering, noisy — was the woman who purchased the *Page 283 
insecticide, which, as we have seen, is a deadly poison, Lawver could not have failed to observe her condition and would not have failed to mention her condition when he described the woman to whom he sold the poison; and yet there is not a word in his testimony that even hints at any such condition in the woman who bought the poison. It is inconceivable — and no doubt the jury so considered it — that a druggist and registered pharmacist sold a deadly poison to a person in Mrs. Bjorkman's condition.
The woman to whom Druggist Nord gave a drinking cup wore dark clothes. Being shown Mrs. Bjorkman's photograph, Nord testified that he did not think it was a picture of the woman to whom he gave the cup.
The bottle that contained the liquid was not found. No autopsy was held, and there was no analysis of the cup or of such part of the liquid as remained in it.
What weight could be given to the testimony of Du Bois? The testimony of disinterested witnesses was to the effect that when the officers saw him at the hospital at the time of Mrs. Bjorkman's death Du Bois had been drinking. At the trial his answers were such as to justify the inference that he was under the influence of intoxicating liquor while testifying, and his conduct and demeanor were such as to cause the court to caution him thus: "The court: Now, here, you don't want to go to jail, do you? Witness: Well, I don't mind, Judge. The court: Well, you will in a minute if you keep on. You will spend some time in jail if you are not going to behave." His testimony with reference to what Mrs. Bjorkman said when she had the cup in her hand was self-contradictory, and the trial court said when denying plaintiff's motion for a new trial, and no doubt the jury found at the trial, that he misled, or attempted to mislead, the court and the jury with reference thereto.
[5] The jury, in considering the weight to be given to the testimony of Du Bois, had a right, and it was their duty, to take into consideration his condition as to *Page 284 
sobriety or otherwise at the time he conversed with Mrs. Bjorkman just before her death, as bearing upon his ability to understand clearly what she said to him; the inconsistency of his testimony; the fact that his testimony in important particulars was contradicted by other witnesses; and his manner and demeanor upon the witness stand; and if, upon considering all the evidence, the jury found that he had willfully and corruptly testified falsely to any fact material to the issues in the case — and the record shows that there was evidence justifying such a finding — they had a right to disregard the whole or any part of his testimony.
But even if the testimony of Du Bois were entitled to full credit, it does not exclude the reasonable hypothesis of accident. Assuming that Mrs. Bjorkman drank the insecticide, it is a justifiable inference from the testimony that this drunken, staggering woman drank it under the impression that it was aspirin and coca cola as she first told Du Bois it was, and then, feeling the sudden effect of the deadly poison, realized the terrible mistake that she had made and thereupon told Du Bois that it was Black Leaf 40 instead of coca cola, whereupon he rushed her to the hospital. This is consistent with the testimony of Du Bois, assuming that Du Bois was in condition to understand what was said, and that he was in condition to repeat it accurately at the trial and disposed to do so.
[6, 7] Considering all the circumstances, the trial court did not err in refusing the defendant's request to take the case from the jury and direct a verdict for the defendant. The case was for the jury, and their finding, approved as it was by the trial court, should not and will not be disturbed by us.
There are other assignments of error, but they are wholly without merit and need not be discussed in this opinion. We find no reversible error in the record. The judgment is affirmed.
MR. JUSTICE BOUCK dissents. *Page 285 
 The following dissenting opinion was filed June 1, 1936, being the final revision of the dissenting opinion filed January 27, 1936.