No. 19,312.

NATIONAL FARMERS UNION LIFE INSURANCE COMPANY,
ET AL. *v.* GLORIA MARGUERITE NORWOOD.

(363 P. [2d] 681)

Decided July 24, 1961

Mr. LOWELL WHITE, Mr. WALTER A. STEELE, for plaintiff in error National Farmers Union Life Insurance Company.

Mr. CHARLES E. GROVER, Mr. RICHARD B. HARVEY, for plaintiff in error Rocky Mountain Empire Insurance Company.

Mr. SAMUEL CHUTKOW, Mr. NOAH A. ATLER, Mr. EDWARD I. HALIGMAN, Messrs. THOMPSON & OZMAN, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE MCWILLIAMS.

GEORGE NORWOOD, age 37, husband of the plaintiff, father of four children, died on January 25, 1957, at St. Joseph's Hospital in Denver, Colorado, from gunshot wounds in the head and chest. The present litigation stems from his untimely death. The ultimate question to be resolved is whether this death was accidental, suicidal, or homicidal and the immediate question is whether the record as made in the trial court poses only a controverted issue of fact to be resolved by the jury or presents a matter of law which should have been resolved by the court.

At the time of his death, George Norwood, as the assured, held a policy of life insurance with National Farmers Union Life Insurance Company (hereinafter referred to as Farmers Union) in the principal sum of $5,000, said policy also containing a so-called double indemnity provision applicable in the event of accidental death. George Norwood also had in force at the time of his death an accident insurance policy with Rocky Mountain Empire Insurance Company (hereinafter referred to as Rocky Mountain), which provided for payment of $2,500 upon the accidental death of the assured. Gloria Norwood, the surviving widow, was sole beneficiary under both policies.

On September 16, 1957, Gloria Norwood brought suit against Farmers Union, alleging that Farmers Union not only owed her $5,000, representing the principal sum called for by the policy, but also owed the additional sum of $5,000, under the following provision of the insurance policy:

"If the Insured hereunder, while this Policy is in full force and effect, suffers loss of life independent of all other causes than the direct result of bodily injury which was affected solely through accidental means, as evidenced by a visible contusion or wound on the exterior of the body or internal injuries revealed by an autopsy, and the date of occurrence of such injury is not more than ninety (90) days prior to the date of death, the Company will, upon receipt of due proof of such loss, subject to all the provisions of this Policy and to the conditions hereof, pay to the Beneficiary or Beneficiaries hereunder an amount equal to the sum Insured under this Policy, as defined on its face, such payment to be in addition to any amount which may otherwise be due."

Claim was also made under this policy for certain dividend deposits and premium refunds allegedly due.

In a separate complaint filed September 16, 1957, Gloria Norwood sued Rocky Mountain, alleging that under its policy Rocky Mountain owed $2,500, its policy

insuring against loss of life resulting "directly and exclusively of all other causes from Accidental Bodily injury sustained during the life of this policy and Occurring Within Ninety Days After The Date of Such Injury."

By its answer Farmers Union admitted that the sum of $6,586.99 was due and owing plaintiff, such sum representing the principal amount called for by the policy and dividends then on deposit plus premium refunds, which it allegedly had theretofore tendered to plaintiff and which had been refused. It denied that an additional $5,000 was due and owing under the double indemnity clause and in support thereof alleged that its policy with the assured also provided:

" * * * 4. This Additional Benefit shall not apply if the Insured's death * * * (b) results directly or indirectly from any of the following causes: * * * (2) Self destruction, sane or insane, or any attempt thereat, or any intentionally self-inflicted injury."

As an affirmative defense it was averred that George Norwood on January 24, 1957, intentionally shot himself twice in the chest and once in the head and that his death resulted from intentionally self-inflicted wounds and not from accidental means.

The answer of Rocky Mountain parallels that of Farmers Union and in essence alleges that the death of George Norwood was not "accidental" but was suicidal and as such specifically excluded by the policy.

These separate actions were consolidated for trial. Upon trial it was stipulated that the two policies above referred to were in full force and effect as of the date of the death of George Norwood and that notice of death and claims were filed within the time provided by the policies. It was further stipulated that "the decedent, George Norwood, came to his death on the 25th of January, 1957, in Denver, Colorado, while a resident of the County of Yuma, State of Colorado, as a result of gunshot wounds suffered on the 24th of January, 1957, on his farm in the County of Yuma, State of Colorado."

Pursuant to C.R.S. '53, 66-8-6 and 24, plaintiff offered in evidence a certified copy of the State of Colorado Standard Certificate of Death. Over vigorous objection this certificate was received in evidence and read to the jury. In this certificate the declarant, who was the chief deputy coroner for the City and County of Denver, in response to "Describe How Injury Occurred" wrote: "Accidentally shot while hunting alone." At this stage of the proceedings plaintiff rested. Motions to dismiss interposed by each defendant were denied. Thereafter defendants called some four witnesses and plaintiff in rebuttal also called four. The testimony of these witnesses will be analyzed in considerable detail later. Suffice it to say that at the conclusion of the evidence defendants' motions for a directed verdict were denied and the case was submitted to the jury, which returned verdicts for the plaintiff against each defendant. Judgments were entered for plaintiff against Farmers Union in the amount of $11,586.99 and against Rocky Mountain for $2,500. Motions for a new trial and for judgment notwithstanding the verdicts were denied, and defendants are here by writ of error seeking reversal of these judgments.

Defendants' first assignment of error is that the trial court erred in refusing to direct a verdict in favor of the defendants at the conclusion of all the evidence. The position of the defending insurance companies is that the undisputed evidence, and particularly the undisputed physical facts attendant upon the death of George Norwood, show conclusively that he died as a result of intentionally (not accidentally) self-inflicted wounds.

We are persuaded that defendants are correct in this contention and that the trial court should have held as a matter of law that George Norwood did *not* die as a result of external, violent and accidental means, but on the contrary died from gunshot wounds which were intentionally self-inflicted. In order to demonstrate this

error of the trial court it becomes necessary to analyze the evidence in some detail.

As was mentioned above, it was stipulated at the outset that the two policies of insurance with which we are here concerned were in full force and effect as of the date of George Norwood's death and also that George Norwood died in Denver on January 25, 1957, as a result of gunshot wounds suffered by him on January 24, 1957, on his farm, located in Yuma County. The only other evidence produced by plaintiff in her case in chief was the introduction of a certified copy of the death certificate of George Norwood, which carried the notation made by the deputy coroner of Denver that the deceased was "accidentally shot while hunting alone." Defendants objected strenuously to the admission of this document and particularly that portion which advised the jury that in the opinion of the deputy coroner of Denver, who quite obviously was acting on hearsay information, the death was "accidental." Defendants argue that such is not a "fact" within the meaning of the applicable statute, C.R.S. '53, 66-8-24, and is "hearsay evidence" of the rankest type. Defendants concede that under the statute and earlier decisions of this Court construing said statute the death certificate is admissible in its *entirety.* They urge, however, that we overrule these cases. Every disputed matter of law simply cannot be litigated and then re-litigated over and over again and the doctrine of stare decisis must control. *Occidental Life Insurance Company v. United States National Bank,* 98 Colo. 126, 53 P. (2d) 1180; and *Prudential Life Insurance Company of America v. Cline, Executor,* 98 Colo. 275, 57 P. (2d) 1205, are ample authority for the trial court admitting into evidence the death certificate in its entirety. And even though the certified copy of the death certificate is prima facie evidence of the facts recited, its weight depends upon the source of the information upon which it is based.

Violent, external and unexplained death is uni-

versally presumed to be accidental. Supported only by this presumption of accidental death and by the copy of the death certificate, which by legislative fiat is made prima facie evidence only of every fact recited therein, the plaintiff rested her case. At this point in the proceedings the trial court was quite correct in denying defendants' motion to dismiss. There being no evidence either of a direct or circumstantial nature as to the manner of death, these presumptions would prevail. However, thereafter defendants and plaintiff in so-called rebuttal offered considerable evidence, all admittedly of a circumstantial nature (there being no eye-witness to the event), which sheds much light on the manner in which Norwood met his death. Whether this evidence overcomes the presumption of accidental death is the precise question to be determined.

From his widow it was learned that George Norwood apparently had no motive to commit suicide and that on the day of his death he left the house in the early afternoon with the announced intention to hunt rabbits. He went alone and took with him a .22 caliber pump rifle. When evening approached and her husband had not returned, Gloria became alarmed and called her brother and father who lived on a nearby farm. They immediately went in search of George and plaintiff's brother quickly located him only 200 yards from the farmhouse. The body was lying on the north side of a fence which ran east and west. This fence was described as "hog wire type on the bottom, 24 inch mesh fence with two barbed wires on the top spaced approximately four inches apart." In response to the question as to the precise location of the body in relation to this fence, the brother of plaintiff stated: "He was lying at a 45° angle to the fence. His left foot was through the bottom mesh on the hog wire fence. He was lying on his back * * *. The gun was on his left side." It was also reported that his coveralls were slightly torn on the right leg and some threads were found on a barb.

It was further established that George Norwood had been shot three times, all at very close range, two of the three shots being into the chest in the general area of the heart and a third shot being into the forehead. One of the two shots in the chest pierced all of the articles of clothing worn by him, i.e. a jacket, coveralls, shirt and undershirt. The other chest shot was only about one inch removed from this previously described chest wound. However, this shot did not pierce the jacket, coveralls or shirt, but only the undershirt. This is circumstantial evidence of a rather compelling nature to indicate that regardless of the sequence of these two chest shots, either before the first chest shot, or more probably between these two chest shots, the jacket, coveralls and shirt were pulled back and the gun muzzle then pressed against the undershirt alone. The pathologist who performed the autopsy testified that neither of the chest shots was fatal in itself, though they were obviously a contributing cause of death. Almost miraculously, each of these two shots missed any vital area, though both were in the immediate heart area. The third external wound was in the middle of the forehead, between the eyes and just above the eyebrow line. This wound was the immediate cause of death, and in the opinion of the pathologist once it was inflicted Norwood was thereafter rendered incapable of "purposeful action." Powder burns on the forehead, jacket and undershirt establish that on each of the three times the rifle was fired the end of the muzzle was very close to the body, and in no event more than a few inches away.

As mentioned above, the deceased took with him a .22 caliber pump rifle and it was established that it was from this weapon the bullets were fired which caused his death. Lt. Joseph Moomaw, a member of the Denver Police Department, was qualified as a ballistics expert, and he testified regarding his examination of the .22 caliber pump rifle and the various tests he made with it. His tests failed to disclose any mechanical defect in its

operation. The rifle measured 28 inches from tip of barrel to the trigger. The decedent was six feet tall, and Lt. Moomaw, who was 5'10½", testified and demonstrated that he could hold the rifle involved, pointed at his chest and within a few inches of his body, and still reach the trigger. In connection with the trigger it was testified that it took 4 to 5 pounds of pull to fire the weapon and is definitely not of the "hair trigger" variety.

It was also established that the gun is not a repeater or automatic type, but that when the trigger is pulled only one shot can be fired and a second shot cannot thereafter be fired until another round of ammunition is placed in the firing chamber, and only after the following sequence of events occurs. In other words, once the trigger is pulled and a cartridge fired, in order to have a new and live bullet enter the firing chamber the pump action must be operated from the full closed position in the following manner: (1) by moving the pump action one-eighth of an inch to the rear to break the lock of the breach and one pound of pressure on the pump-slide is necessary to accomplish this; (2) the pump must then be pulled further to the rear to eject the empty shell and to cock the gun for firing, requiring seven and one-quarter pounds of pressure; (3) the pump action must then be pushed forward to receive and position a fresh round of ammunition, requiring one pound of pressure; (4) and finally the pump must be returned forward eight inches under six pounds of pressure to complete the cocking of the breach and the final positioning of the shell in the chamber. Only when all this has been done could the rifle be fired for a second time, and, of course, repeated once again in order to fire a third shot.

Without unduly prolonging this opinion, the foregoing is believed to be a fair recital of the evidence produced at the trial. It should be noted, in passing, that much of plaintiff's evidence offered in "rebuttal" was not properly rebuttal in nature, but should have been part of

292

her case in chief. Be that as it may, in disposing of the matter we consider the record in its entirety.

The ultimate question posed is whether the trial court properly submitted the case to the jury, or on the contrary should have granted defendants' motion for a directed verdict. The "presumption against suicide" and the recitals contained in the death certificate are only *prima facie* evidence of accidental death. Neither is conclusive, and each is rebuttable by evidence, be it direct or circumstantial, which tends to show the actual circumstances surrounding the death. In 46 C.J.S. p. 402 appears the following:

"The fact of death does not of itself create any presumption that it was the result of an accident. * * * Where, however, it is apparent that * * * the death of insured was the result of external and violent means, and the issue is as to whether it was due to an accident * * * the presumption is in favor of accident and against the existence of facts bringing the case within any of the exceptions of the policy, such as * * * suicide. *These presumptions may, however, be overcome by facts and circumstances establishing the contrary.*" (Emphasis supplied.)

See, also, *Lampkin v. Travelers Insurance Company,* 11 C.A. 249, 52 Pac. 1040; *Bickes v. Travelers Insurance Company,* 87 Colo. 297, 287 Pac. 859; and *Michael v. John Hancock Mutual Life Insurance Co.,* 138 Colo. 450, 334 P. (2d) 1090. And in *Occidental Life Insurance Co. v. United States National Bank,* supra, we said:

"When death by unexplained violent external means is established, the law does not presume suicide or murder; the presumption is to the contrary. Such a showing is prima facie proof that the death was accidental. * * * *But that prima facie showing may be overcome by evidence either direct or circumstantial. In the present case there was more than the bare fact of death by unexplained violent external means; there were circum-*

*stances sufficient to require a finding whether the death was accidental or suicidal."* (Emphasis supplied.)

So, in the instant case, should this "finding whether the death was accidental or suicidal" be made by the jury as a controverted issue of fact or by the trial court as a matter of law? We hold that the latter alternative was, under all the circumstances of this case, the only proper one.

The defendants' position is that the physical facts surrounding the death of George Norwood and particularly the manner and method of operation of the death weapon itself precludes any reasonable hypothesis, except one of suicidal death. This unfortunate death was necessarily either homicidal, suicidal or accidental. The parties themselves have ruled out homicidal death. Of the remaining alternatives defendants argue that all of the facts and circumstances are reasonably consistent only with suicidal and not accidental death.

Apparently recognizing the extreme difficulty of arguing the reasonability of the theory that George Norwood *accidentally* shot himself on three separate and successive occasions, each time in a critical area of the body, with this particular type of a non-automatic weapon, plaintiff submits as her reasonable hypothesis that decedent *accidentally* shot himself first in the head, and thereafter intentionally fired two more shots in an effort to attract help, mistakenly thinking that he was firing these last two shots into the air when actually he was holding his rifle "backwards" and so, instead of firing these two shots into the air, was in reality firing them into his chest in the general area of the heart. The mere recital of such hypothesis demonstrates its complete "unreasonableness."

Cases considering the issue of suicidal or accidental death are legion, and the only common thread is the oft-repeated observation that each case must stand on its own particular factual situation. However, in *Central States Life Insurance Company v. McElwee,* 199 Ark.

410, 133 S.W. (2d) 881, where the decedent suffered five separate wounds from a non-automatic weapon, it was said: "The theory that he may have shot himself accidentally is preposterous. No reasonable mind could conclude that McElwee shot himself accidentally five times at intervals of a minute or more." In this case the Arkansas Supreme Court reversed the trial court and dismissed the claim. In *New York Life Insurance Company v. Dick*, 252 F. (2d) 43, decedent was shot twice by his double barrel shotgun, and in support of an order that a directed verdict should have been entered in favor of the defending insurance company, it was said:

"One can believe that even an experienced hunter might accidentally shoot himself once, but the asserted theory that he could accidentally shoot himself first with one barrel and then with the other stretches credulity beyond the breaking point. * * * Our conclusion is that the infliction of two wounds in succession, one in the left side in close proximity to the heart, and the other in the head, cannot be reconciled with any reasonable theory of accident, and that, under the evidence the question whether the death was accidental was not a question of fact for the jury."

We are not unmindful that on appeal to the United States Supreme Court this case was reversed by a divided court. *Dick v. New York Life Insurance Company*, 359 U.S. 437. Nevertheless, the logic and reasoning of the Court of Appeals is deemed even more appropriate and applicable to the facts of the instant case and in our opinion is most convincing and persuasive.

■ Under all the circumstances of the case the trial court should have directed a verdict in favor of defendants for the reason that any reasonable mind must inevitably, though reluctantly, be forced to the conclusion that George Norwood could not have accidentally shot himself three times in succession with this type of .22 caliber pump rifle by which his death was accomplished. Under the undisputed facts such would be a physical

impossibility. Accidental death having thus been eliminated from the case; and homicidal death having been eliminated by the parties themselves; there remains as the only reasonable alternative, suicide. Unlike the plaintiff's hypothesis the defendants' hypothesis is both reasonable and consistent with the controlling facts of the case. Their hypothesis is that George Norwood for reasons apparently known only to himself was determined to take his life. In carrying out his design he shot himself first in the chest area, through all his articles of clothing, i.e. jacket, coveralls, shirt and undershirt. This shot being non-fatal, he again shot himself in the chest area, but this time pulling back his jacket, coveralls and shirt and placing the muzzle against his undershirt. This shot again proving non-fatal, he then placed the gun to his forehead and fired the bullet which ended his life.

The judgment against Rocky Mountain is reversed and remanded with directions to dismiss the complaint in that action.

The judgment against Farmers Union insofar as it relates to plaintiff's claim for double indemnity under the accidental death provisions of the policy is reversed and the cause remanded with directions to dismiss that part of plaintiff's claim. The balance of plaintiff's judgment against Farmers Union, namely for $6,586.99, is not here under attack and in fact has already been satisfied by the defendant.

■ One final matter involves the propriety of the belated order of the trial court awarding the plaintiff interest on the amount found to be due and owing from Farmers Union. The chronology in this regard is that on June 19, 1959, the trial court entered a judgment for plaintiff and against Farmers Union for $11,586.99, no part of which sum represented interest. Nor was interest ordered by the trial court at that time, although the entire judgment, but for this reversal, would, of course, draw interest from that date on. On September 16, 1959,

the trial court apparently on the basis of an informal request ordered that its judgment of June 19, 1959, be amended by adding the words "together with interest thereon from and after the 25th day of January, A.D. 1957." Defendants complain, inter alia, that this "amendment" comes too late and should for that reason alone be vacated. This identical problem was considered by this Court in *Green v. Hoffman,* 126 Colo. 104, 251 P. (2d) 933, where such an "amendment" was held to be untimely and therefore improper. Accordingly, the judgment awarding plaintiff interest from and after January 25, 1957, is also reversed and remanded with direction that the order authorizing such be vacated.

MR. CHIEF JUSTICE HALL and MR. JUSTICE MOORE concur.