The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 16, 2023

**2023COA108**

**No. 22CA1502, *Gresser v. Banner Health* — Health and Welfare — Health Care Availability Act — Limitation of Liability — Award in Excess of Limitation**

A division of the court of appeals considers the scope of a trial court's discretion to award past and future economic damages once the court decides to lift the $1 million statutory cap in a case governed by the Health Care Availability Act. As a matter of first impression, the division holds that, after making the necessary findings to exceed the cap pursuant to section 13-64-302(1)(b), C.R.S. 2023, a trial court retains its authority to reduce by remittitur the jury's award of past and future economic damages in excess of the cap if the court determines that such award is grossly and manifestly excessive in light of the evidence before the jury.

The division concludes that the trial court applied the correct standard by first conducting a "good cause" and "unfairness" analysis to lift the cap, and then by awarding damages for past and future economic damages in the amount the jury found because the record amply supported that amount and it was not grossly and manifestly excessive. In light of this determination, and because the division disagrees with the other contentions of error, the division affirms the judgment entered in favor of the plaintiffs.

Court of Appeals No. 22CA1502
Weld County District Court No. 19CV30976
Honorable Todd Taylor, Judge

Chance Gresser, individually and as parent, natural guardian, next of friend and on behalf of his daughter, C.G., and Erin Gresser, individually and as parent, natural guardian, next of friend and on behalf of her daughter, C.G.,

Plaintiffs-Appellees,

v.

Banner Health, d/b/a North Colorado Medical Center,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE LIPINSKY
Welling and Gomez, JJ., concur

Announced November 16, 2023

Bachus & Schanker, LLC, Darin L. Schanker, J. Howard Thigpen, Melanie Sulkin, Denver, Colorado; Barrios Kingsdorf & Casteix, LLP, Zachary Wool, New Orleans, Louisiana; Pendley, Baudin & Coffin, LLP, Jessica Perez, Plaquemine, Louisiana, for Plaintiffs-Appellees

Hall Booth Smith, P.C., Elizabeth Moran, Greenwood Village, Colorado; Mauro Lilling Naparty LLP, Richard J. Montes, Woodbury, New York, for Defendant-Appellant

¶ 1     The Colorado General Assembly enacted the Health Care Availability Act (HCAA) four decades ago to "contain[] the significantly increasing costs of malpractice insurance for medical care institutions and licensed medical care professionals" and "in recognition of the exodus of professionals from health-care practice or from certain portions or specialties thereof." § 13-64-102(1), C.R.S. 2023.  Among other provisions, the HCAA caps at $1 million the tort damages awardable against all defendants for a course of care provided to a patient by a health care professional or a health care institution.  § 13-64-302(1)(b), C.R.S. 2023.  The HCAA provides limited circumstances in which a trial court may lift the cap to award "the present value of additional past and future economic damages only."  *Id.*

¶ 2     However, once a court makes the appropriate findings and lifts the cap, the HCAA does not specify how the court must determine the amount of such excess damages.  No prior Colorado case has addressed this issue.  The General Assembly's silence could mean that, upon lifting the cap, the court possesses the discretion to reject the jury's award and independently determine the amount of such additional damages.  Alternatively, it could mean that, if the

1

court decides to exceed the cap, it must enter a judgment for economic damages in the same amount as the jury's calculation of such damages.

¶ 3      In this case, defendant, Banner Health, d/b/a North Colorado Medical Center, appeals the judgment entered in favor of plaintiffs, Chance and Erin Gresser, following a jury trial.  The Gressers, individually and on behalf of their minor daughter, C.G., asserted a medical negligence claim against Banner Health premised on the alleged failure of its nursing staff to timely recognize and report to C.G.'s treating physicians that C.G. was exhibiting signs of sepsis. The jury found in favor of the Gressers, and the court entered judgment in their favor in the amount of $39,845,196.83.

¶ 4      After the jury rendered its verdict, the trial court determined it was appropriate to lift the cap.  The trial court concluded that its application of the cap was "binary": it was required either to impose the $1 million cap or enter a judgment in the amount that the jury had calculated for past and future economic damages.  It chose the latter option and entered the full amount the jury had awarded.

¶ 5      We disagree with the court's reading of the HCAA.  We hold that, after making the necessary findings to exceed the statutory

2

cap, a trial court may, but is not required to, award additional damages in the amount that the jury determined.

¶ 6     But the court's discretion is not limitless.  To determine the scope of that discretion, we look to the case law governing judicial review of jury damages awards.  Under that case law, a court possesses the authority to set aside a jury's award of damages if the award was "grossly and manifestly excessive." *Bohlender v. Oster*, 165 Colo. 164, 168, 439 P.2d 999, 1001 (1968).  Although the trial court erred by characterizing its available options as "binary," it undertook the correct analysis before adopting the jury's calculation of additional past and future economic damages.  Because we also reject Banner Health's other claims of error, we affirm.

## I.     Background

¶ 7     C.G. was born at Banner Health.  Late on the second day of her life, C.G. was transferred to the neonatal intensive care unit (NICU), where she received antibiotics to treat a possible infection.  The following morning, lab results confirmed that C.G. had an E. coli infection.  By that time, C.G. had developed sepsis.  As a result of the sepsis, she suffered irreversible neurological injuries, including cerebral palsy and cognitive and developmental delays.

3

¶ 8     The Gressers alleged that nurses employed by Banner Health breached their duty of care by failing to timely notify C.G.'s physicians that C.G. was exhibiting signs of sepsis, and that such failure resulted in delayed treatment and caused C.G.'s injuries.

¶ 9     The jury found that Banner Health was negligent and that its negligence was the proximate cause of C.G.'s injuries.  The jury awarded the Gressers damages totaling $27,647,274.23, which included past and future medical and other health care expenses to 2075, as well as lost future wages from 2038 to 2070.  The court entered a total judgment of $39,845,196.83, consisting of the jury's award and pre- and post-filing interest.

## II.     Analysis

¶ 10     Banner Health contends that the court erred by (1) misinterpreting and misapplying the HCAA's statutory cap for past and future economic damages; (2) allowing an expert witness to testify outside the scope of his qualifications to establish causation; (3) precluding Banner Health's economist from providing opinion testimony regarding the present value of C.G.'s future life care plan assuming a life expectancy of fifty-eight; and (4) permitting the Gressers' counsel to insinuate that Banner

Health's attorneys had colluded with Banner Health's witnesses to fabricate testimony. We agree, in part, with Banner Health's first argument but hold that the court did not err by awarding the Gressers past and future economic damages in the amount the jury found. We disagree with Banner Health's second, third, and fourth arguments.

## A. The Damages Cap in the HCAA

¶ 11 The HCAA places an additional burden on plaintiffs seeking to recover more than $1 million from all defendants in any civil action for damages in tort brought against a health care professional or a health care institution. Even if such plaintiffs prove their damages to a jury, section 13-64-302(1)(b) provides that they also must prove to the court good cause for an award of past and future economic damages in excess of the $1 million cap. The court cannot award damages that surpass the cap unless, "upon good cause shown," the court "determines that the present value of past and future economic damages would exceed such limitation and that the application of such limitation would be unfair." § 13-64-302(1)(b).

¶ 12 The plaintiff bears the burden of establishing both good cause, which means a "legally sufficient reason," and unfairness, meaning

"marked by injustice, partiality, or deception." *Wallbank v. Rothenberg*, 140 P.3d 177, 180 (Colo. App. 2006) (first quoting Black's Law Dictionary 235 (8th ed. 2004); and then quoting Webster's Third New International Dictionary 2494 (1986)).

¶ 13    Banner Health contends that the court misinterpreted section 13-64-302(1)(b) to permit only a binary choice between enforcing the statutory cap or awarding the full amount that the jury determined.  Because the court "felt constrained by a binary choice," Banner Health argues, the court did not properly consider the totality of the circumstances in its good cause and unfairness analysis.  We conclude that the court properly applied the good cause and unfairness analysis when deciding to lift the cap and that, although we disagree with its characterization of the scope of its discretion to determine the amount of additional past and future economic damages, it made the necessary findings before entering the jury's award.

### 1.    The Court Did Not Abuse Its Discretion in Deciding to Lift the Cap

¶ 14    Banner Health alleges five errors in the court's application of the good cause and unfairness standard in section 13-64-302(1)(b).

"In making findings as to 'good cause' and 'unfairness,'" trial courts must consider the "totality of circumstances." *Vitetta v. Corrigan,* 240 P.3d 322, 329 (Colo. App. 2009). We review the court's determination for an abuse of discretion. *Wallbank,* 140 P.3d at 179.

¶ 15    First, we disagree with Banner Health's contention that the court "failed to consider and balance any relevant factors in determining good cause and unfairness." Banner Health erroneously asserts that the court only considered the sufficiency of the evidence to support the jury's verdict. Rather, as the Gressers explain, the court also weighed the type and permanency of C.G.'s injuries, her continuous need for intensive and expensive therapies, her life expectancy, and that her future medical expenses would exceed $1 million even if she were fully covered by Medicaid.

¶ 16    Specifically, in determining that the Gressers had established good cause for exceeding the cap, and that enforcing the cap would be unfair, the court pointed to the evidence establishing that C.G. "suffered severe, permanent neurological injuries, a number of which she will never be able to overcome, and those injuries that she can learn to overcome will require [her] to be engaged in

7

intensive, and expensive, therapies for much, if not all, of her life." Further, the court noted that "$1 million would not even compensate the Gressers for C.G.'s past medical expenses."

¶ 17 The court also found that the Gressers presented "substantial, and largely unchallenged, evidence" of the cost of the future care C.G. would require to "improve her quality of life" and to "avoid the risks and complications that her neurological deficits will continue to present over her lifetime." The court said it would be unfair to deprive C.G. of such care and opportunities for improvement.

¶ 18 The court determined that it would also be unfair not to compensate C.G.'s mother, who would continue to care for C.G. as an around-the-clock nurse's aide and thus be unable to work outside the home. Finally, the court found that "there is no doubt that [C.G.] will never earn wages," that the jury's award of future lost wages was within the range to which Banner Health's expert had testified, and that such award did not duplicate the jury's award for future medical expenses.

¶ 19 Although Banner Health takes issue with the lack of countervailing factors in the court's analysis, "a court may exercise its discretion to consider factors *it* deems relevant," *id.* at 180-81

(emphasis added); it is not bound to consider all of the factors the *parties* deem relevant.

¶ 20　Second, we reject Banner Health's contention that the Gressers did not meet their burden of proving that C.G.'s past medical expenses were $2.5 million. Banner Health does not assert that the Gressers provided *no* evidence to support this figure. Rather, although the parties stipulated to the authenticity of the bills for C.G.'s medical expenses, Banner Health argues that "the $2.5 million awarded reflects a fictitious charged amount as opposed to the amount [the Gressers] actually paid." Specifically, it asserts that the Gressers "failed to disclose the amount of any liens and what portion of the judgment would be for third-party subrogation claims," and that they were required to do so under the statute governing collateral source evidence in medical malpractice actions. *See* § 13-64-402, C.R.S. 2023.

¶ 21　This argument fails. Although that statute requires courts to determine "the amount, if any, due the third party payer or provider and enter its judgment in accordance with such finding," § 13-64-402(3), the provisions do not apply when the third party payer or provider is Medicaid. *See* § 13-64-402(4). Banner Health

does not allege that any third party payer or provider other than Medicaid furnished medical assistance to or on behalf of C.G. And it cites no authority indicating that plaintiffs must submit evidence of liens or subrogation claims from Medicaid to satisfy their burden of proof on damages.

¶ 22    Importantly, the court found that the jury's award of more than $2.5 million for C.G.'s past medical expenses was "amply supported by the evidence admitted at trial." To support its argument that the $2.5 million "reflected only the fictitious charged amount," Banner Health points to a single document from Children's Hospital, which states, "This is not a bill. This is an itemization of hospital services." In our view, this is insufficient to overturn, on sufficiency of the evidence grounds, the court's finding. *See Northstar Project Mgmt., Inc. v. DLR Grp., Inc.*, 2013 CO 12, ¶ 14, 295 P.3d 956, 959 (explaining that appellants bear the burden of "designating 'all evidence relevant' to the finding or conclusion challenged on sufficiency of the evidence grounds" (quoting C.A.R. 10(b)). Banner Health does not allege that the Gressers never received those services. And even if Medicaid initially covered the cost of those services, the Colorado Department of Health Care

10

Policy and Financing (the state department) has an automatic lien by virtue of section 25.5-4-301(5)(a), C.R.S. 2023, for the amount of the medical assistance it furnished to or on behalf of C.G. *See* § 25.5-4-301(5)(a) ("When the state department has furnished medical assistance to or on behalf of a recipient pursuant to the provisions of this article, and articles 5 and 6 of this title, for which a third party is liable, the state department shall have an automatic statutory lien for all such medical assistance.").

¶ 23    Without further explanation or cites to the record indicating otherwise, we presume the court properly found that the $2.5 million damages award was supported by the evidence. *See* C.A.R. 28(a)(7)(B) (requiring an appellant's arguments to contain "citations to the . . . parts of the record on which the appellant relies"); *Love v. Klosky*, 2016 COA 131, ¶ 18, 417 P.3d 862, 864 ("We presume that the trial court's findings and conclusions are supported by the evidence when the appellant has failed to provide a complete record on appeal."), *aff'd on other grounds*, 2018 CO 20, 413 P.3d 1267; *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.*, 923 P.2d 328, 335 (Colo. App. 1996) ("[I]t is not the duty of the reviewing court to search the record for evidence to support bald assertions."),

*aff'd*, 940 P.2d 348 (Colo. 1997). We are not in a position to reweigh the evidence, and we do not perceive that the trial court abused its discretion in making this finding.

¶ 24    Third, we disagree with Banner Health's assertion that the court erred by failing to consider the implications of a special needs trust (SNT) in its assessment of good cause. Although the Gressers presented evidence that they intended to create an SNT for C.G., the jury awarded zero damages for the "cost to set up and operate a trust." Even assuming the Gressers elect to set up an SNT for C.G. at a later date, the SNT would only impact C.G.'s *future* medical expenses, as such trusts are intended to preserve an injured party's eligibility for Medicaid benefits. But Medicaid benefits are an "exception to the collateral source statute that ought not inure to the benefit of the tortfeasor." *Pressey v. Child.'s Hosp. Colo.*, 2017 COA 28, ¶ 14, 488 P.3d 151, 157, *overruled on other grounds by Rudnicki v. Bianco*, 2021 CO 80, 501 P.3d 776. Thus, because the court could not reduce the damages award to the Gressers by the amount of any Medicaid payments furnished to or on behalf of C.G., the court did not abuse its discretion by declining to consider such payments when determining whether the Gressers had satisfied

12

their burden for exceeding the cap. *See id.* at ¶ 22, 488 P.3d at 158. We reject Banner Health's invitation to depart from *Pressey*.

¶ 25    Additionally, this case is distinguishable from *Scholle v. Ehrichs*, in which a division of this court determined that the trial court erred by finding that the plaintiff owed money to third-party payers or providers, and by relying on such erroneous finding in deciding to lift the cap. 2022 COA 87M, ¶ 126, 519 P.3d 1093, 1115 (*cert. granted* Apr. 10, 2023). Here, by contrast, the court found that the Gressers presented ample evidence of past and future medical expenses, and Banner Health conceded that C.G.'s future medical costs would exceed $1 million even if Medicaid fully covered certain of her future expenses.

¶ 26    Fourth, we are not persuaded by Banner Health's argument that the General Assembly intended to limit the good cause exception for future earnings to extraordinary circumstances, such as where the plaintiff has established "a unique capacity and history of extraordinary earnings that have been cut short by the injury." Banner Health supports this contention with comments from a single legislator whose comments were not tethered to any statutory language. *See* Hearings on S.B. 143 before the H.

13

Business Affairs & Labor Comm., 56th Gen. Assembly, 2d Reg. Sess. (Mar. 10, 1988) (statement of Rep. Patrick A. Grant). But "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979). Significantly, Banner Health does not point to any controlling authority *precluding* a court from considering a permanently disabled child's future lost wages in deciding whether to lift the statutory cap. Similarly, Banner Health fails to provide any record cites to support its assertion that C.G.'s lost future wages duplicated other damages. The court expressly found that the damages awarded to the Gressers were not duplicative based on their life care planner's testimony that, to prevent overcompensation, she purposefully excluded from C.G.'s life care plan items that C.G. would need regardless of her injuries.

¶ 27     Finally, we reject Banner Health's contention that the court erred by finding good cause to exceed the cap for the purpose of awarding prefiling interest to the Gressers. Banner Health asserts that prefiling interest is included in the $1 million cap "and cannot be lifted."

14

¶ 28 "[P]refiling, prejudgment interest is part of 'damages' capped under the HCAA, subject to being uncapped upon a showing of good cause and unfairness . . . ." *Scholle*, ¶ 107, 519 P.3d at 1112; *see also Rudnicki v. Bianco*, 2023 COA 103, ¶ 44, ___ P.3d ___, ___ ("[P]refiling, prejudgment interest on 'past and future economic damages' is part of 'past and future economic damages' and is awardable beyond the $1 million limitation, provided the other requirements of the statute are met." (quoting § 13-64-302(1)(b))). Banner Health cites to no authority holding that a separate good cause analysis is required to lift the cap for the purpose of awarding prefiling interest. Because, as explained above, we discern no abuse of discretion in the court's good cause and unfairness analysis, which extends to the court's award of prefiling interest, it properly awarded prefiling interest in excess of the cap.

¶ 29 For these reasons, we conclude that the court did not abuse its discretion by finding that the Gressers had shown good cause for exceeding the cap and that application of the cap would be unfair.

¶ 30 We next review the court's interpretation of the HCAA in analyzing how it should determine the present value of past and future economic damages.

15

## 2. Although the Court Misinterpreted Section 13-64-302(1)(b), Its Misinterpretation Does Not Require Reversal of Its Damages Award

### a. Statutory Interpretation

¶ 31 We review the court's interpretation of section 13-64-302(1)(b) de novo. *Wallbank,* 140 P.3d at 179. "We construe statutes to give effect to the intent of the General Assembly. To determine that intent, we look first to the plain language of the statute, reading the words and phrases in context and construing them according to their common usage." *Morris v. Goodwin,* 185 P.3d 777, 779 (Colo. 2008) (citation omitted). "If, however, the language is ambiguous, meaning it is silent or susceptible to more than one reasonable interpretation, we may use extrinsic aids of construction, 'such as the consequences of a given construction, the end to be achieved by the statute, and the statute's legislative history.'" *People v. Jones,* 2020 CO 45, ¶ 55, 464 P.3d 735, 746 (quoting *McCoy v. People,* 2019 CO 44, ¶ 38, 442 P.3d 379, 389).

¶ 32 The relevant provision of the HCAA states as follows:

> The total amount recoverable for all damages . . . in any civil action for damages in tort brought against . . . a health-care institution . . . shall not exceed one million dollars, present value per patient . . . ; except that, if,

16

upon good cause shown, the court determines that the present value of past and future economic damages would exceed such limitation and that the application of such limitation would be unfair, *the court may award in excess of the limitation the present value of additional past and future economic damages only.*

§ 13-64-302(1)(b) (emphasis added).

¶ 33    After a court lifts the cap, section 13-64-302(1)(b) is silent as to how a court determines the amount of such additional damages to award the plaintiffs.  No published Colorado case directly answers this question.  In *Wallbank v. Rothenberg*, 74 P.3d 413, 420 (Colo. App. 2003), after holding that the trial court erred by lifting the statutory cap without a finding of "good cause," the division directed the court on remand to award the plaintiff lost future earnings in the amount the jury had determined.  But the division did not accept the jury's calculation of such damages reflexively; it expressly held that the evidence was sufficient to support the jury's award.  *See id.*  Thus, while the jury's calculation of damages still plays a role in HCAA cases, the existing case law does not clarify the weight a court must or should give to the jury's

damages award or the parameters of the court's discretion in calculating damages in excess of the $1 million cap.

¶ 34 We are not persuaded by the parties' respective interpretations of the HCAA, which "imply words that simply are not there." *People v. Diaz*, 2015 CO 28, ¶ 15, 347 P.3d 621, 625 (quoting *People v. Benavidez*, 222 P.3d 391, 394 (Colo. App. 2009)). The Gressers argue that the trial court correctly concluded it had a binary choice under section 13-64-302(1)(b), and that, once it lifts the cap, it is bound by the jury's award of past and future economic damages.

¶ 35 By contrast, Banner Health contends that the court has "great flexibility" and discretion in quantifying the amount of additional past and future economic damages to award to the plaintiff. For example, under Banner Health's reading of section 13-64-302(1)(b), a court may exceed the cap for certain categories of damages while declining to exceed the cap for other categories. *See Vitetta*, 240 P.3d at 325, 329 (affirming trial court's decision not to exceed the statutory cap for lost earnings where patient's daily living expenses were already included in the award for her future life care and medical expenses). Citing dicta in a district court order, Banner Health also asserts that a court may conclude that, even if it

determines that imposition of the cap would be unfair, it may find that "good cause does not exist to raise the cap all the way" to the amount of the jury's award. *See Gallegos v. LeHouillier*, No. 13CV32156, 2020 WL 6694174, at *4 (Colo. Dist. Ct., El Paso Cnty. Apr. 22, 2020) (concluding, despite its dicta, that "the cap should be raised . . . to permit the full loss determined by the jury to be compensated") (unpublished order).

¶ 36     Rather than engraft such limitations or authorities onto the statute, we read section 13-64-302(1)(b) against the backdrop of the case law addressing judicial review of jury damages awards generally, so long as that case law is consistent with the legislature's intent in enacting the HCAA. *See Larrieu v. Best Buy Stores, L.P.*, 2013 CO 38, ¶ 13, 303 P.3d 558, 561 ("When the General Assembly legislates in a particular area, we presume it was aware of existing case law precedent."); *Williams v. White Mountain Constr. Co.*, 749 P.2d 423, 428 (Colo. 1988) ("In the face of statutory silence, questions of interpretation are governed by legislative intent.").

¶ 37     Generally, "[t]he amount of damages to which an injured party is entitled is a matter within the sole province of the jury." *Ochoa v.*

19

*Vered*, 212 P.3d 963, 972 (Colo. App. 2009). Nonetheless, the reasonableness of a jury's award is "always subject to judicial scrutiny in the post-trial and appellate stages of a case." *Averyt v. Wal-Mart Stores, Inc.*, 265 P.3d 456, 462 (Colo. 2011). Thus, even in cases subject to the cap, "the trial court . . . retains its authority to reduce by remittitur an award it determines to be excessive in light of the evidence before the jury." *Garhart v. Columbia/Healthone, L.L.C.*, 95 P.3d 571, 582 (Colo. 2004). Under that authority, a court may set aside the verdict if it is "grossly and manifestly excessive." *Ochoa*, 212 P.3d at 973. But the court may not disturb the amount "unless it is completely without support in the record." *Id.*

¶ 38     Nothing in the HCAA suggests that the General Assembly intended to alter this interplay between the jury verdict and the court's review of that verdict when calculating the amount of additional past and future economic damages to award after it lifts the cap. The General Assembly enacted the HCAA based on its understanding that the cap would "contain[] the significantly increasing costs of malpractice insurance." § 13-64-102(1). Section 13-64-302(1)(b) adds the extra step of the "good cause" and

"unfairness" analysis before the court can lift the cap. But the HCAA does not lessen a court's discretion, once the court lifts the cap, by enforcing a binary "cap or jury verdict" choice contrary to the courts' longstanding remittitur authority. Neither does the HCAA bestow greater discretion on a court by allowing it to undertake its own independent calculations of additional past and future economic damages unmoored from the jury's determination of such damages.

¶ 39 We find support for this interpretation in *Pisano v. Manning*, 2022 COA 22, ¶¶ 23-24, 510 P.3d 572, 576, in which a division of this court interpreted section 13-21-102.5(3)(a), C.R.S. 2023, which contains an analogous damages cap to that found in section 13-64-302(1)(b). Section 13-21-102.5(3)(a) and (c) provide that damages for noneconomic loss or injury awarded in civil actions (other than medical malpractice actions) are capped at $250,000, adjusted for inflation every two years, "unless the court finds justification by clear and convincing evidence therefor." *Id.* The division determined that the additional requirement of "clear and convincing evidence" applies to the court's justification for exceeding the cap, and not to the fact of damages. *Pisano*, ¶ 24,

510 P.3d at 576. In other words, section 13-21-102.5(3)(a) does not alter the standard of proof in applicable cases. *Id.* at ¶ 25, 510 P.3d at 577. In the same way, we conclude that the "good cause" and "unfairness" analysis required under section 13-64-302(1)(b) applies only to a trial court's decision to exceed the cap and not to the calculation of additional damages.

### b. The Court's Application

¶ 40 Although the court erred by believing it had only a binary choice in awarding additional damages to the Gressers, it conducted the correct analysis in quantifying the amount of such damages. The court first conducted the good cause analysis, as described in Part II.A.1 above, and made findings regarding the unfairness of imposing the cap by considering the reasonableness of the jury's award for each category of damages — past medical expenses, future medical expenses, and future lost wages.

¶ 41 After finding good cause to lift the cap, the court then acknowledged it could disregard the jury award if the amount of damages was unsupported by the evidence or indicated that the jury was improperly motivated by passion or prejudice. Following its review of the record, however, the court found that "substantial

evidence supports the jury's award of economic damages" and that the award was "not grossly and manifestly excessive."

¶ 42     Thus, the court correctly concluded that it would be improper to adjust the amount of damages that the jury had awarded. Accordingly, as the court expressly stated, it entered its judgment "consistent with the jury's verdict . . . in conjunction with the court's findings." This approach is consistent with the case law governing judicial review of jury awards.

¶ 43     We disagree with Banner Health's assertion that the court improperly engrafted the "grossly and manifestly excessive" standard for a C.R.C.P. 59 remittitur onto its "good cause" and "unfairness" analysis for lifting the HCAA cap. In HCAA cases, a court may exercise its remittitur authority by analyzing the present value of past and future economic damages on a "case-by-case" basis, *Garhart*, 95 P.3d at 582, but only *after* it has found that the plaintiff established the good cause and unfairness necessary to lift the cap. As we explain above, the court properly kept these analyses separate — it first found good cause to lift the cap, and then it determined the award was not "grossly and manifestly excessive." *Id.* Based on the latter determination, the court

23

declined to set aside the damages award as quantified in the verdict.

¶ 44    In sum, while we disagree with the court that it was faced with a binary choice, once it decided the cap should be lifted, it did not err by awarding the Gressers the same amount of past and future economic damages that the jury had calculated.

    B.    Dr. Rimawi's Expert Opinions on Causation

¶ 45    Over Banner Health's objection, the Gressers called Ramzy Rimawi, M.D., to testify on causation.  At trial, Dr. Rimawi opined that administration of antibiotics to C.G. at specific times during her second day in the hospital would have "prevented the permanent neurological harm" she later suffered.  Banner Health contends that the court should have precluded Dr. Rimawi from testifying on causation because he "was not qualified to opine on whether a reasonable pediatric specialist would have ordered antibiotics."  Relatedly, Banner Health argues that the court should have entered judgment notwithstanding the verdict in its favor because Dr. Rimawi was the Gressers' only causation expert and, without his testimony, they could not prove their negligence claim.

Because we disagree with Banner Health's first argument, its second argument necessarily fails.

### 1. Relevant Law and Standard of Review

¶ 46 Trial courts provide an important gatekeeping function in determining whether a jury should hear particular expert testimony. *See Bocian v. Owners Ins. Co.*, 2020 COA 98, ¶ 45, 482 P.3d 502, 513. Colorado Rule of Evidence 702 governs a trial court's determination as to the admissibility of expert testimony. *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." CRE 702. This inquiry focuses on "(1) the reliability of the scientific principles, (2) the qualifications of the witness, and (3) the usefulness of the testimony to the jury." *Shreck*, 22 P.3d at 70.

¶ 47 "A witness may be qualified by virtue of any one of the five factors" specified in CRE 702. *Huntoon v. TCI Cablevision of Colo. Inc.*, 969 P.2d 681, 690 (Colo. 1998). "Under this liberal rule, a

25

court may admit expert testimony if the witness can offer 'appreciable' assistance on a subject beyond the understanding of an 'untrained layman.'" *People in Interest of Strodtman*, 293 P.3d 123, 129-30 (Colo. App. 2011) (quoting *People v. Williams*, 790 P.2d 796, 798 (Colo. 1990)).

¶ 48   "Trial courts are vested with broad discretion to determine the admissibility of expert testimony.  Therefore, we will not overturn a trial court's decision absent an abuse of discretion."  *Est. of Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011) (citation omitted).  In addition, we review de novo a trial court's denial of a motion for judgment notwithstanding the verdict.  *Smith v. Surgery Ctr. at Lone Tree, LLC*, 2020 COA 145M, ¶ 8, 484 P.3d 745, 749.

### 2. The Court Did Not Abuse its Discretion by Finding that Dr. Rimawi Was Qualified to Offer Opinions on Causation

¶ 49   We agree with the court that Dr. Rimawi possessed the requisite knowledge, skill, experience, training, and education in the areas of infectious diseases, sepsis, treatment of sepsis, and management of sepsis regarding patients of all ages to provide expert testimony on causation.  Dr. Rimawi testified that he is board certified in internal medicine, infectious diseases, and critical

26

care medicine. He explained that he studies how infections happen, how to treat them, and the consequences of not treating them. While working as an emergency room physician, Dr. Rimawi gained experience in suspecting and treating sepsis in newborns through his daily treatment of infected infants.

¶ 50    At the time of trial, Dr. Rimawi worked at Emory University Hospital, which he characterized as "probably one of the top in the world for critical care medicine." At Emory, he cared for adults in the intensive care unit (ICU) and served on committees that developed treatment protocols for patients of all ages, including those in the NICU. For example, Dr. Rimawi chaired Emory's resuscitation committee, which reviewed incidents in which protocols, such as those for treating sepsis, were not followed. And he was a member of the antibiotic stewardship committee, which set forth standards for the administration of antibiotics.

¶ 51    Additionally, Dr. Rimawi was involved in developing Emory's "surviving sepsis guidelines," which provide guidance on management of sepsis and a screening tool to assist practitioners in determining whether a patient has developed sepsis. Further, Dr. Rimawi taught how to suspect and spot sepsis to medical

students, nurse practitioners, family practice doctors, pediatricians, and obstetrical-gynecological doctors. All of these professionals treat infants and need to know how to recognize sepsis in newborns.

¶ 52 Based on Dr. Rimawi's credentials and experience, we hold that the court did not abuse its discretion by determining that Dr. Rimawi was "sufficiently qualified to offer opinions related to treating sepsis in neonates" and that he could testify as to "how [Banner Health's] nursing staff's alleged delay in treatment may have caused [C.G.'s] injuries." Similarly, the court did not abuse its discretion by permitting him to testify "as to what a reasonable physician would have done" with regard to treating C.G. "had certain information been provided." All these opinions related to causation.

¶ 53 Although Banner Health attacks Dr. Rimawi's lack of specific experience in and knowledge of treating newborns in a well baby hospital unit, such gaps in his background do not alter our determination that Dr. Rimawi was qualified to offer "appreciable" assistance on "a subject beyond the understanding of an 'untrained layman'" — sepsis treatment and management of patients of any

28

age.  *Strodtman*, 293 P.3d at 130 (quoting *Williams*, 790 P.2d at 798).

¶ 54　First, while Banner Health characterizes Dr. Rimawi as "an *adult* infectious disease physician," it fails to point to any material difference between the training of pediatric physicians to suspect, manage, or treat sepsis and that of physicians who primarily treat adults.  On the contrary, Dr. Rimawi testified that one does not need to be a *pediatric* infectious disease doctor to spot the signs of sepsis in a newborn.  The "primary consideration" in determining Dr. Rimawi's qualifications for recognizing and treating sepsis in newborns is his "actual 'knowledge, skill, experience, training or education', rather than [his] particular title."  *Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990) (quoting CRE 702).

¶ 55　Second, Banner Health asserts that Dr. Rimawi was "not familiar with the normal respiratory rate, voiding patterns, or feeding patterns for neonates," or with the pain scoring system for such patients.  But the record shows that he obtained that information through research.  Banner Health does not explain why Dr. Rimawi would need to know such data points without reference to medical authorities to determine when C.G. developed sepsis.

29

¶ 56    Third, although Dr. Rimawi lacked specific experience in a postpartum unit and was not credentialed to treat patients under the age of eighteen at the time of trial, he had treated infants with sepsis, and he was involved in developing protocols and screening tools for sepsis treatment of patients of all ages. *See Huntoon*, 969 P.2d at 690 ("There is no requirement that a witness hold a specific degree, training certificate, accreditation, or membership in a professional organization, in order to testify on a particular issue.").

¶ 57    Finally, Banner Health takes issue with Dr. Rimawi's lack of publications on neonatal infection. However, Dr. Rimawi testified that he participated in peer review of manuscripts submitted to journals and served on the editorial boards of various publications, including the Journal of Neonatal Biology. Moreover, he is a prolific author on subjects relating to infectious diseases generally and sepsis specifically.

¶ 58    Thus, while such alleged gaps might impact the "weight and credibility" a jury may afford Dr. Rimawi's testimony, they did not preclude him from providing opinion testimony in this case. *See Strodtman*, 293 P.3d at 130. The trial court did not abuse its discretion by determining that Dr. Rimawi was qualified to offer

opinion testimony, even though his resume lacked the credentials that Banner Health deemed necessary for an expert offering an opinion on an infant's sepsis infection.

¶ 59 In addition, because Dr. Rimawi was qualified to offer an opinion on causation, the court properly denied Banner Health's motion for judgment notwithstanding the verdict premised on Dr. Rimawi's alleged lack of sufficient knowledge and experience.

¶ 60 We next consider whether the court properly limited Dr. Rimawi's opinion testimony to his areas of expertise.

### 3. Dr. Rimawi Did Not Testify Outside the Scope of His Expertise

¶ 61 Banner Health further argues that the trial court erred by permitting Dr. Rimawi to provide opinions that fell outside the scope of the subject areas for which the court qualified him as an expert.

¶ 62 In circumscribing the scope of Dr. Rimawi's testimony, the court specified that he could not "testify as to the appropriate standard of care," which the parties agree was the standard of care for nurses. The court explained that, while Dr. Rimawi could not testify "as to what a nurse should or should not have done," he

31

would be "permitted to testify as to what a reasonable *physician* would have done had certain information been provided."

¶ 63 Accordingly, the court qualified Dr. Rimawi to offer opinions regarding important links in the causal chain: he could opine that delayed reporting of C.G.'s symptoms caused a delay in the administration of antibiotics, which caused C.G.'s sepsis to progress, which caused C.G.'s injuries.

¶ 64 The majority of Dr. Rimawi's testimony involved a general description of sepsis. He connected this testimony to his opinion on causation, explaining that a patient with suspected sepsis should be started on antibiotics within three hours. He said "those three hours are really critical" because of the exponential growth rate of bacteria. Such testimony was within the scope of the areas for which the trial court had qualified Dr. Rimawi as an expert on sepsis.

¶ 65 Applying his expertise to the facts of C.G.'s case, Dr. Rimawi testified that C.G. was "very far along" the stages of sepsis by 8:30 p.m. on the second day of her hospitalization, when she was tachycardic and grunting. He opined that starting the antibiotics at 6 p.m. that day would have prevented C.G.'s permanent

neurological injuries. Dr. Rimawi explained that starting them when C.G. was admitted to the NICU after 11 p.m. was "too late" because certain of her organs, such as her brain, were already dying by that time. Dr. Rimawi concluded that "earlier antibiotics would have had an effect, more likely than not, that . . . would have prevented [C.G.'s] complications." This causation testimony fell within Dr. Rimawi's designation as an expert in sepsis and its treatment and management, and the testimony did not, as Banner Health contends, improperly constitute an opinion on the standard of care for nurses.

¶ 66 Dr. Rimawi also testified that a reasonable physician would have begun treating C.G. with antibiotics upon learning from Banner Health's nursing staff that C.G. was showing signs of sepsis. This opinion testimony fell within the permissible scope of Dr. Rimawi's endorsement as an expert. While it tangentially related to a physician's standard of care, it was not a standard of care opinion. Rather, it focused on the significance of the length of time that elapsed between when C.G. first showed signs of sepsis and when she was first administered antibiotics. This testimony thus related to a chain in the element of causation and supported

33

the Gressers' theory that C.G. would not have suffered neurological injuries had Banner Health's nurses timely reported the symptoms of sepsis to C.G.'s physicians.

¶ 67    For these reasons, we hold that Dr. Rimawi did not testify outside the scope of those subject areas in which the court had qualified him as an expert.

### C. The Court's Exclusion of Opinion Testimony Regarding the Present Value of C.G.'s Life Care Plan Based on a Life Expectancy of Fifty-Eight

¶ 68    At trial, counsel for Banner Health asked their expert economist, Dr. Eric Joshua Drabkin, to opine on the present value of C.G.'s life care plan based on a life expectancy of fifty-eight years. The court sustained the Gressers' objection to such testimony on the ground that Banner Health had not previously disclosed this present value figure to the Gressers. Banner Health argues the court erred by doing so. We disagree.

### 1. Additional Facts

¶ 69    Before trial, the Gressers and Banner Health exchanged expert reports on issues relating to the amount of the Gressers' damages. The Gressers engaged John Lawrence Merritt, M.D., to opine on C.G.'s anticipated life expectancy. In his report, Dr. Merritt stated

34

that the "natural life expectancy" is eighty-one years for a girl in the United States with the same race and ethnicity as C.G. He noted that "[a] reduced life expectancy is most closely correlated with ability for self-mobility and ability to feed oneself," but he opined that C.G. "has shown steady progress in areas of motor skills, and it is to a reasonable degree of medical probability that with continued intensive rehabilitation training [C.G.] will achieve these mobility and swallowing goals in the coming years." He concluded that "[h]er life expectancy therefore should not be significantly affected by her injuries, with provision of optimal medical and supportive care."

¶ 70     In addition, the Gressers disclosed expert reports concerning C.G.'s future medical and other health care costs and the present value of those costs.

¶ 71     Banner Health designated Dr. Drabkin, an economist, to provide his own calculation of the present value of C.G.'s life care plan based on three different life expectancies — seventeen, twenty-one, and "normal life expectancy" of 77.29 years — and on the expert opinions calculating the amount of C.G.'s future care costs. Dr. Drabkin calculated that the present value of C.G.'s life care

plan, assuming a "normal life expectancy," was $22,712,545. Changing the life expectancy figure materially impacted the present value calculation because it affected the length of time C.G. would require care.

¶ 72 At trial, Dr. Merritt reiterated his opinion that C.G.'s injuries would not shorten her life. On cross-examination, counsel for Banner Health challenged this opinion by asking whether scientific literature "suggest[s] — and I believe you testified during your deposition — that 83 percent of cerebral palsy patients have a life expectancy of less than 58 years." Banner Health suggested during the examination that such statement appears in papers published by Drs. Jordan Brooks, Robert Shavelle, David Strauss, and others (the Shavelle papers).

¶ 73 After Dr. Merritt said he did not recall "testifying to that" during his deposition, counsel for Banner Health attempted to impeach him with his deposition testimony, asking whether during the deposition, she had asked, "You were aware of the Strauss and Shavelle literature that reflects that 80 percent have a life expectancy less than 58 years. Do you see that?" Dr. Merritt responded during his cross-examination at trial that he was "aware

36

of that statement in the literature."  But he did not testify that he agreed with the statement.

¶ 74   The court allowed the jurors to submit questions to the experts.  In response to juror questions, Dr. Merritt said that C.G.'s life expectancy would be reduced by fifteen percent if she were unable to self-feed and by another fifteen percent if her ability to self-ambulate did not improve.  No party objected to these questions.

¶ 75   After Dr. Merritt answered the juror's questions, the court allowed the attorneys to ask follow-up questions.  In response to a question from counsel for the Gressers, Dr. Merritt said that C.G.'s life care plan provided for "early intervention to keep [C.G.] healthy so that she can reach her full life expectancy," and he noted that she had been making "remarkable progress on feeding and ambulation," much more so than he "would have thought after the first exam."

¶ 76   During recross-examination, Dr. Merritt agreed that, if C.G. was unable to feed herself and unable to self-ambulate, her life expectancy would be reduced by a total of thirty percent, which was roughly "24 off the 78 additional years," or slightly below fifty-eight.

But, as noted above, Dr. Merritt indicated at other times during his examination that he disagreed with the assumptions underlying the question — that C.G. would never feed herself or self-ambulate. Thus, he never adopted the opinion that C.G. would only live to age fifty-eight.

¶ 77      During Dr. Drabkin's direct examination later in the trial, counsel for Banner Health elicited his calculations of the present value of C.G.'s future care costs based on a life expectancy of twenty-two ($4,300,577) and of eighty-one ($22,873,393).

¶ 78      Counsel for Banner Health then asked Dr. Drabkin whether he had calculated the present value of C.G.'s future care costs using a life expectancy "approximately for the mid-50s," based on Dr. Merritt's testimony regarding a potential thirty percent reduction in C.G.'s life expectancy.  The Gressers' counsel objected. The court sustained the objection on the ground that Dr. Drabkin had not previously disclosed this opinion.

¶ 79      At the conclusion of trial, the jury found that C.G. would incur future "medical and other health care expenses" until 2075, when she would turn fifty-eight.  It determined that the amount of damages in this category was $23,930,000 — a figure higher than

38

Dr. Drabkin's present value calculation that assumed a full life expectancy.

## 2. Standard of Review and Applicable Law

¶ 80 "We review a trial court's decision on evidentiary issues for an abuse of discretion, and a trial court does not abuse its discretion unless its ruling is manifestly arbitrary, unreasonable, or unfair." *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 32, 374 P.3d 443, 453.

¶ 81 Under C.R.C.P. 26(a)(2)(B)(I), a party must disclose specified information for each of its retained experts, including "a complete statement of all opinions to be expressed and the basis and reasons therefor." C.R.C.P. 26(a)(2)(B)(I)(a). The purpose of the mandatory disclosure rule is to "ensure that discovery information is provided early and is updated in a timely manner, thus promoting accuracy, encouraging settlements, *and avoiding surprises at trial.*" *D.R. Horton, Inc.-Denver v. Bischof & Coffman Constr., LLC*, 217 P.3d 1262, 1267-68 (Colo. App. 2009) (emphasis added).

¶ 82 C.R.C.P. 37(c)(1) provides:

> A party that without substantial justification fails to disclose information required by C.R.C.P. 26(a) . . . shall not be permitted to

present any evidence not so disclosed at trial . . . , unless such failure has not caused and will not cause significant harm, or such preclusion is disproportionate to that harm.

¶ 83    "[U]nder C.R.C.P. 37(c), a trial court has a duty to sanction a party for failure to comply with certain discovery deadlines by precluding evidence or witnesses, *unless* the party's failure to comply is *either* substantially justified *or* harmless." *Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 975 (Colo. 1999); *see also Cath. Health Initiatives Colo. v. Earl Swensson Assocs., Inc.*, 2017 CO 94, ¶ 15, 403 P.3d 185, 188 (noting that, subsequent to the 2015 amendments to C.R.C.P. 37, the "harm and proportionality analysis under [C.R.C.P.] 37(c)(1) remains the proper framework for determining sanctions for discovery violations"). "The burden is on the non-disclosing party to establish that its failure to disclose was either substantially justified or harmless." *Todd*, 980 P.2d at 978.

¶ 84    The failure to disclose does not result in automatic preclusion of evidence at trial. "Rule 37(c)(1)'s framework is flexible, not absolute, and the trial court has the discretion to fashion an appropriate sanction proportionate to any harm caused." *Cath. Health Initiatives Colo.*, ¶ 11, 403 P.3d at 188.

### 3. The Court Did Not Abuse Its Discretion by Precluding Dr. Drabkin from Testifying Regarding the Present Value of C.G.'s Life Care Costs Assuming a Life Expectancy of Fifty-Eight

¶ 85 For two reasons, we hold that the court did not abuse its discretion by precluding Dr. Drabkin from offering his previously undisclosed opinion regarding the present value of C.G.'s life care plan assuming she would live to fifty-eight.

¶ 86 First, Dr. Merritt never testified that he believed C.G. would only live to fifty-eight. Although Dr. Merritt agreed at trial that C.G.'s life expectancy could drop to fifty-eight if she never learned to feed herself or self-ambulate, he rejected the application of these assumptions to C.G. Dr. Merritt said it was "more likely than not" that "with continued optimal care," C.G. could have "a full life expectancy." He said that C.G. was "making significant progress" with walking and predicted that, "if she continues to make these kind of gains over the next few years," she "will be ambulating sufficiently in order to get the exercise that prevents the deleterious effect of immobility." Dr. Merritt also said "it's much more likely than not that she will be able to achieve . . . the ability to feed herself" and that the factors of feeding and "the ability to mobilize"

41

will not "weigh in on reducing her life expectancy." Thus, Dr. Merritt consistently stated that, in his view, C.G. would have a full life expectancy.

¶ 87 Because Dr. Merritt did not accept the assumptions underlying a conclusion that C.G. would only live to fifty-eight, the court did not abuse its discretion by precluding Dr. Drabkin from providing the jury with a new, previously undisclosed present value calculation premised on the assumption that Dr. Merritt had adopted the fifty-eight-year life expectancy figure.

¶ 88 Second, even if Dr. Merritt's testimony following the juror's questions amounted to a new opinion regarding C.G.'s life expectancy, such opinion would not have come as a surprise to Banner Health. During Dr. Merritt's deposition, as during trial, Banner Health attempted to discredit Dr. Merritt's full-life-expectancy opinion by asking him to acknowledge that the Shavelle papers, on which he relied in developing his opinion, suggested that "80 percent of cerebral palsy patients have a life expectancy of less than 58 years." Thus, Banner Health was aware of the fifty-eight-year figure during Dr. Merritt's deposition and it could not claim surprise regarding the figure being discussed at trial. If Banner

Health intended to press Dr. Merritt on the fifty-eight-year life expectancy at trial — as it had during his deposition — it should have disclosed Dr. Drabkin's calculation of the present value of C.G.'s life care plan based on that figure in the event its strategy succeeded and Dr. Merritt agreed that C.G.'s life expectancy could be fifty-eight years under certain circumstances.

¶ 89    We next consider whether, under the applicable test, Banner Health's failure to disclose Dr. Rabkin's new present value calculation before trial was justified.  In *Todd*, our supreme court set forth a nonexhaustive list of factors for determining whether a party's failure to make a pretrial disclosure was "substantially justified or harmless":

> (1)   the importance of the witness's testimony;
>
> (2)   the party's explanation for its failure to comply with the required disclosure;
>
> (3)   the potential prejudice or surprise to the party against whom the testimony is offered that would arise from allowing the testimony;
>
> (4)   the availability of a continuance to cure such prejudice;

(5)    the extent to which introducing such testimony would disrupt the trial; and

(6)    the non-disclosing party's bad faith or willfulness.

*Todd*, 980 P.2d at 978.  Considering these factors, we conclude that the court did not abuse its discretion by barring Dr. Drabkin from offering at trial his previously undisclosed present value calculation of C.G.'s life care plan premised on a life expectancy of fifty-eight.

¶ 90    First, we agree with Banner Health that the testimony was important.  After hearing a life expectancy figure of fifty-eight bandied about in the courtroom, even if Dr. Merritt did not agree with that figure, the jury could — and did — conclude that C.G. would likely live to fifty-eight.  Thus, it would have been helpful for the jury to have Dr. Drabkin's calculation of the present value of C.G.'s life care plan premised on a fifty-eight-year life expectancy.

¶ 91    Second, we disagree with Banner Health's contention that it could not have disclosed before trial Dr. Drabkin's calculation of the present value of C.G.'s life care plan to age fifty-eight because Dr. Merritt's testimony following the juror's questions came as a surprise.  As we explain above, such testimony should not have come as a surprise to Banner Health because it was familiar with

the Shavelle papers throughout the case. Indeed, since the discovery phase of the case, Banner Health had pressed Dr. Merritt to agree that the Shavelle papers suggested a life expectancy for C.G. of "less than 58 years."

¶ 92    Third, the Gressers faced potential prejudice or surprise if the court allowed Dr. Drabkin to provide a new present value calculation at trial. Even if, as Banner Health asserts, Dr. Drabkin used "the exact same methodology from his reports and deposition," with the only difference being the life expectancy factor, the Gressers likely would have had no opportunity to review or question that calculation absent a continuance of the trial.

¶ 93    Fourth, it is generally burdensome to place a jury trial on hold. *See People v. Smith*, 275 P.3d 715, 722 (Colo. App. 2011) (The burden of "assembling the witnesses, lawyers, and jurors at the same place at the same time . . . counsels against continuances except for compelling reasons." (quoting *Morris v. Slappy*, 461 U.S. 1, 11 (1983))). Dr. Drabkin sought to provide his new opinion on the sixth day of a jury trial. In any event, the Gressers did not request a continuance and Banner Health did not propose one. Rather, the court simply disallowed Dr. Drabkin's testimony

regarding the new calculation because it was "undisclosed testimony."

¶ 94 Fifth, the record does not reflect the extent to which the introduction of the challenged evidence would have disrupted the trial, if at all. We cannot speculate whether, had the court permitted Dr. Drabkin to provide his new, undisclosed opinion, the Gressers would have sought a continuance for the purpose of, among other reasons, obtaining a competing calculation of the present value of C.G.'s life care plan premised on a life expectancy of fifty-eight.

¶ 95 Sixth, the record does not establish whether Banner Health's attempt to present Dr. Drabkin's new present value calculation midtrial reflected, or did not reflect, bad faith or willfulness.

¶ 96 In sum, although the first *Todd* factor weighs in favor of admission of Dr. Drabkin's new opinion, factors two, three, and four weigh in favor of preclusion. Factors five and six are neutral. Accordingly, we hold that the court's ruling on the admissibility of Dr. Drabkin's new opinion was not "manifestly arbitrary, unreasonable, or unfair," *Murray*, ¶ 32, 374 P.3d at 453, and therefore was not an abuse of discretion.

### D. Counsel's Suggestions that Banner Health and Its Witnesses Colluded to Fabricate Testimony

¶ 97     The trial in this case was hard-fought and included contentious cross-examinations and arguments. Banner Health asserts that the court erred by permitting the Gressers' counsel to "insinuate — through pervasive questioning and arguments — that Banner Health's attorneys and their client-witnesses colluded to fabricate testimony." Banner Health contends that the court should have provided the jury with a curative instruction addressing the impropriety of the Gressers' counsel's suggestions of collusion or, alternatively, should have taken the case away from the jury and entered a judgment in favor of Banner Health because the insinuations of the Gressers' counsel deprived Banner Health of a fair trial.

¶ 98     We perceive no error.

### 1. Additional Facts

¶ 99     Counsel for the Gressers questioned several of Banner Health's employees about their meetings with Banner Health's attorneys to prepare for the employees' depositions and trial. Specifically, during the examinations of Banner Health's nurses and

doctors, counsel for the Gressers elicited admissions that Banner Health's counsel represented each of them individually, as well as testimony regarding the length of their meetings with counsel to prepare for their depositions and trial, the persons present at those meetings, and the materials the attorneys asked the witnesses to review. The court overruled Banner Health's initial objections to this line of questioning, determining that the information was relevant to reveal the witnesses' potential bias, and noting that the questioning did not implicate the attorney-client privilege.

¶ 100 However, as counsel for the Gressers persisted with this line of questioning, the court sustained several of Banner Health's objections. For example, after nurse Alayna Blevins confirmed that at least five other hospital employees were present during one of her meetings with the attorneys, the court sustained an objection to the question from the Gressers' counsel whether she was "familiar with the phrase 'get your stories straight'" on the grounds that it was argumentative. The court also agreed it was improperly argumentative for the Gressers' counsel to ask nurse Rachel Ortiz Ververs, "And here we are, four years later, after the meeting with the [hospital] lawyers and a lawsuit has been filed, ma'am; and you

48

and Nurse Quinones have a completely different story from what Dr. [Abigail] Myers [one of C.G.'s treating physicians] wrote down, don't you?"

¶ 101     Banner Health also asserts that the Gressers' counsel asked improperly argumentative questions during the examination of Dr. Myers. For example, counsel for the Gressers asked Dr. Myers whether she was aware that Banner Health's attorneys had designated her as an expert and had disclosed her anticipated opinion testimony to counsel for the Gressers nine months before the attorneys had first contacted her about serving as an expert. Counsel for the Gressers also elicited testimony from Dr. Myers that Banner Health's lawyers had asked her to review transcripts of the depositions of other hospital employees and the defense's expert reports, but not transcripts of the depositions of the Gressers or the reports of their experts. Banner Health objected when the Gressers' counsel then asked whether "that sounds an awful lot like cherrypicking information" and whether being "only given one side of the story" could "slant [her] opinion and understanding" of the facts.

¶ 102    During a bench conference to discuss Banner Health's objections to this questioning, the court expressed concern that it suggested "the lawyers have done something improper, unethical." While the court determined that the information Dr. Myers "was provided or not provided is relevant," it instructed counsel for the Gressers to "move on from this line of questioning."

¶ 103    After the Gressers rested their case-in-chief, Banner Health renewed its objection to "the continual questioning of the witnesses on the number of times, the length of time, and information that they obtained from the meetings with [Banner Health's] lawyers — consistently referred to as the Banner lawyers." Banner Health argued the attorney-client privilege made it impossible to "cross-examine or direct the witnesses on what they did or what they talked about, [or] how long the meetings were" for the purpose of neutralizing the insinuations inherent in counsel for the Gressers' questions.

¶ 104    Accordingly, Banner Health asked the court to provide the jury with a curative instruction that "such conduct by the [Banner Health] lawyers . . . is not improper and therefore the attorney[-]client privilege protects such things and it cannot be held

50

against [Banner Health and its employees]." Banner Health requested a mistrial as an alternative remedy, arguing that, without a curative instruction, there would be no way to "correct the opinions of this jury" that Banner Health's lawyers had "done something unethical."

¶ 105 The court denied Banner Health's requests for a curative instruction and for a mistrial. It determined that none of the questions sought the disclosure of privileged information, questioning regarding the witnesses' preparation for their depositions and trial was "fair game" and "relevant" for weighing their credibility, and a curative instruction would invade the jury's role in weighing the evidence. Although the court expressed concern "from a systemic level" about how the insinuations from both sides would cause "cynicism . . . to trickle down and affect the jurors' perceptions of the system of justice," it concluded that the Gressers' counsel had not "crossed a line that would warrant" the relief that Banner Health sought.

¶ 106 Later in the trial, the Gressers' counsel challenged a physician witness who testified that, unlike other doctors, he chose not to refer to "apnea" in his notes even though C.G. had stopped

breathing. The Gressers' counsel retorted, "That testimony is not good for Team Banner, is it, those notes in the records? Those aren't good for Team Banner?" The court sustained Banner Health's objection that the question was argumentative and advised the jury that it should disregard the "improper" and "inappropriate" term "Team Banner." The court told the jury, "It's important you make your decisions here based on the facts in the case and not on any characterizations of one side or the other in the case."

¶ 107 During closing argument, the Gressers' counsel asked the jurors to consider whether the Banner Health employees who testified were not credible because they were "to[e]ing the company line." But Banner Health's counsel did not object to this statement.

¶ 108 After the jury returned its verdict in favor of the Gressers, Banner Health moved for a new trial on the grounds that the Gressers' counsel's "constant and pervasive implication that defense counsel engaged in wrongdoing and manipulated witness testimony denied [Banner Health] of the right to a fair trial." The court denied the motion.

### 2. Standard of Review and Relevant Law

¶ 109    Trial courts have broad discretion to set the scope and limits of cross-examination for bias, *Bonser v. Shainholtz*, 3 P.3d 422, 424 (Colo. 2000); determine "the form and the style of jury instructions," *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 601 (Colo. App. 2007); and evaluate "the prejudicial impact of misconduct by opposing counsel and of any irregularities at trial," *Acierno v. Garyfallou*, 2016 COA 91, ¶ 28, 409 P.3d 464, 469 (citation omitted). Accordingly, we review for an abuse of discretion the court's denial of Banner Health's request for a curative instruction, a mistrial, and a new trial in response to the aggressive questioning of counsel for the Gressers.

¶ 110    "[A] witness's credibility is for the fact-finder to decide, subject to the trial court's discretion" regarding whether "violations of the ethical rules implicate the fairness of the proceedings." *Murray*, ¶ 21, 374 P.3d at 451. When assessing witnesses' credibility and thus the weight to give their testimony, the jury may consider factors such as the consistency of the witnesses' testimony, whether other witnesses contradicted them, and the witnesses' manner and demeanor on the witness stand. *Prudential Ins. Co. of Am. v. Cline*,

98 Colo. 275, 284, 57 P.2d 1205, 1209 (1936), *overruled on other grounds by Lockwood v. Travelers Ins. Co.*, 179 Colo. 103, 498 P.2d 947 (1972). "Cross-examination for bias is liberally permitted because bias is always relevant as discrediting the witness and affecting the weight of his or her testimony." *Evans v. Colo. Permanente Med. Grp., P.C.*, 902 P.2d 867, 874 (Colo. App. 1995), *aff'd in part and rev'd in part on other grounds*, 926 P.2d 1218 (Colo. 1996).

¶ 111    At the same time, attorneys have a duty to confine their arguments to the jury within proper grounds. *United States v. Young*, 470 U.S. 1, 8 (1985). An attorney seeking to attack a witness's credibility should avoid challenging the witness's moral character. *See People v. Couch*, 179 Colo. 324, 329, 500 P.2d 967, 969 (1972). Moreover, "[a] trial is not a referendum on the conduct of the attorneys, and disparagement of opposing counsel is improper." *People v. Garcia*, 2012 COA 79, ¶ 13, 296 P.3d 285, 288. Thus, attorneys "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate." *Young*, 470 U.S. at 9.

### 3. The Court Did Not Err by Refusing to Grant Banner Health's Requests for a Curative Instruction, a Mistrial, or a New Trial

¶ 112    The Gressers' counsel walked a fine line during their aggressive questioning of Banner Health's witnesses. It was not improper for counsel to explore whether Banner Health's witnesses had coordinated their testimony at joint trial preparation sessions with Banner Health's lawyers, whether those lawyers had scripted the opinions of one of Banner Health's experts, whether the expert's opinions were not based on all relevant facts, and whether a witness had withheld material information in his notes regarding C.G.'s symptoms. But accusations of lawyer or witness conduct such as "getting stories straight" and "cherrypicking" information, even if potentially proper in closing argument, have no place during the examination of witnesses absent evidence of misconduct not present here. A witness's meeting with a lawyer to prepare for trial does not, without more, establish collusion or other unethical conduct. All the more, absent unusual circumstances not present here, few reasonable lawyers would allow a client to testify without any preparation.

¶ 113    Against this backdrop, the court did not abuse its discretion in evaluating the risk of prejudice to Banner Health resulting from the challenged questioning and selecting an appropriate remedy in response to the Gressers' counsel's insinuation of collusion between Banner Health's witnesses and lawyers.

¶ 114    First, the court correctly determined that the questioning regarding the time the witnesses spent with counsel, the materials the witnesses reviewed with the lawyers, and the presence of others at the trial preparation sessions did not implicate the attorney-client privilege.  *See Guy v. Whitsitt*, 2020 COA 93, ¶ 21, 469 P.3d 546, 551.  Because those facts may influence a witness' testimony, that questioning was relevant to the witnesses' credibility.  The questioning did not improperly probe into communications between Banner Health's attorneys and the witnesses.  Although Banner Health is correct that it was unable to respond to the questioning by counsel for the Gressers by eliciting testimony as to the substance of those communications because the communications were privileged, Banner Health's tactical disadvantage does not mean that the questioning was improper.  Thus, the court did not abuse its discretion by allowing the Gressers' counsel to ask the

56

Banner Health employees about their meetings with Banner Health's counsel.

¶ 115 Second, the court correctly sustained Banner Health's objections to the argumentative questions that more directly alluded to collusion. The court's rulings were effective; they cut off further questioning attacking the character of the witnesses or counsel for Banner Health. Similarly, the court's instruction to the jury to disregard the reference to "Team Banner" precluded the Gressers' counsel from repeating the phrase and advised the jury to decide the case based on the facts and not on characterizations of the parties. Absent evidence to the contrary, we presume that the jury followed the court's instructions. *See Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 (Colo. 2011). These actions sufficiently remedied any risk of prejudice to Banner Health resulting from the problematic questioning. *See Smith v. Kinningham*, 2013 COA 103, ¶ 34, 328 P.3d 258, 265.

¶ 116 Third, it was not manifestly arbitrary, unreasonable, or unfair for the court to decline to give a curative instruction that Banner Health lawyers' conduct in preparing the witnesses was "not improper" and that the jury should not hold against Banner Health

the "accusations that something was done unethically." The court explained that it was not the court's "call as to whether or not the way the witnesses were prepared leads to the possibility that either they were coached, or . . . that they had an opportunity to get their testimony straight." Further, the court reasoned that Banner Health's lawyers had been able to effectively counter any implied accusations of impropriety. Because the trial court did not abuse its discretion by declining to provide a mid-trial curative instruction, the court likewise did not abuse its discretion by denying Banner Health's request for the "most drastic" remedy of a mistrial. *Id.* (quoting *Bloom v. People*, 185 P.3d 797, 807 (Colo. 2008)).

¶ 117    Fourth, we do not consider Banner Health's specific challenge to the statements in the Gressers' counsel's closing argument because Banner Health did not contemporaneously object to those statements. "[T]his is not one of the exceptionally rare civil cases that warrants reversal based on an unpreserved claim of error." *Pinnacol Assurance v. Laughlin*, 2023 COA 9, ¶ 22, 528 P.3d 912, 916.

¶ 118     Finally, because the court did not abuse its discretion in addressing each of the challenged questions, we affirm its denial of Banner Health's motion for a new trial premised on those questions. The court was in the best position to evaluate whether the conduct of the Gressers' counsel prevented Banner Health from having a fair trial. *See Acierno*, ¶¶ 27-28, 409 P.3d at 469. It was not manifestly arbitrary, unreasonable, or unfair to conclude that the Gressers' counsel's questioning did not warrant the drastic remedy of a new trial.

¶ 119     We reject Banner Health's invitation to grant a new trial based on the out-of-state cases cited in its opening brief. We have reviewed those cases and are not persuaded that they support Banner Health's position that the relief it seeks is warranted because they are either distinguishable or inapposite. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (reversing and remanding for new trial in criminal case where the prosecutor told the jury "[defense counsel] wants to distract you" and "[defense counsel] needs to make sure that they get their stories straight"); *Sizemore v. Fletcher*, 921 F.2d 667, 669-71 (6th Cir. 1990) (affirming grant of habeas relief where the prosecutor denigrated the

defendant's right to counsel by arguing that the defendant had hired seven attorneys to "get [the] story straight" and "take[] care of everything"); *State v. Underwood*, 418 P.3d 658, 666 (Haw. 2018) (vacating conviction where the prosecutor told jury that the "defense attorney tried to get [the witness] to make up some story"); *People v. Witted*, 398 N.E.2d 68, 78 (Ill. App. Ct. 1979) (ordering new trial in criminal case where the prosecutor told the jury that defense counsel would have witnesses "say whatever he wants" and admonished the jury not to let defense counsel "hide behind technicalities in the law"); *Ky. Guardianship Adm'rs, LLC v. Baptist Healthcare Sys., Inc.*, 635 S.W.3d 14, 28 (Ky. 2021) (The trial court did not err by precluding counsel from asking an adverse witness, "[H]ow many times have you rehearsed your testimony?").

## III. Disposition

¶ 120    The judgment is affirmed.

JUDGE WELLING and JUDGE GOMEZ concur.